## LUMAGHI COAL CO. v. HELVERING, Commissioner of Internal Revenue.

### No. 11940.

Circuit Court of Appeals, Eighth Circuit.

Jan. 5, 1942.

Rehearing Denied Feb. 9, 1942.

Chase Morsey, of St. Louis, Mo. (E. Miltenberger Cain, of St. Louis, Mo., on the brief), for petitioner.

Harry Marselli, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This is a proceeding to review a decision of the Board of Tax Appeals sustaining a deficiency in income tax of Lumaghi Coal Company for the year 1934 assessed by the Commissioner upon his determination that the coal company was entitled only to $13,-637.15 depletion deduction, and not to $29,-354.41, the amount taken by the taxpayer on its return. The case involves the determination of the amount allowable to the taxpayer as a deduction for depletion under Section 114(b) (4) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Code, § 114(b)

(4), which allows in the case of coal mines a depletion deduction of 5 percent of the gross income from the property, not to exceed 50 percent of the net income of the taxpayer (computed without allowance for depletion) from the property. The Board found the facts as follows:

"The petitioner is a corporation organized under the laws of the State of Illinois with its principal place of business at St. Louis, Missouri.

"Among other properties owned by the petitioner at all times material herein were approximately 12,000 acres of coal land located near Collinsville, Illinois, upon which was operated what was known as Mine No. 2. Most of the coal sold by petitioner during the taxable year was produced at this mine, though during the year the petitioner realized a small gross profit from the sale of coal bought from other mines.

"Prior to 1931 petitioner shipped most of its coal by railroad cars, which were loaded at the tipple of the mine. During that year it erected six concrete bins or silos, approximately 800 feet from the mine and adopted the practice of transporting a portion of the coal by railroad cars to the silos.

"The coal before being transported to the silos was cleaned and sized at the mine, but after reaching the silos was subjected to further sizing inasmuch as some of it was broken in handling.

"After the erection of the silos and during the taxable year the petitioner continued its practice of loading a substantial portion of its coal on railroad cars at the tipple of the mine for shipment to customers; but during the taxable year approximately two-thirds of the coal produced, or 225,609.90 tons, was sold to customers from its silos and storage facilities for an aggregate amount of $353,916.09.

"The advantage of having the silos lay principally in the fact that the mine was operated only fourteen or fifteen days per month and ordinarily coal could be delivered at the tipple only when the mine was in operation. By having the silos, purchasers of coal could be supplied at any time and the coal could be loaded in trucks for immediate shipment. The erection of the silos enabled petitioner to sell substantially more coal than it otherwise could have sold.

"In addition to the silos petitioner also maintained storage plant facilities, one located upon its own property and the other upon property which it rented. The price per ton for the coal was the same regard-less of whether it was sold at the tipple, the silos, or the storage plants, and regardless of where the coal was loaded; but the truck prices generally were higher than the car-load lots.

"During the taxable year petitioner maintained an office in St. Louis, Missouri, and employed salesmen for the purpose of selling coal. Petitioner did not own any trucks, but upon occasion hired some and delivered the coal, especially to large industrial concerns. Most of petitioner's other customers called for the coal in their own trucks. During the year 1934 petitioner produced and sold to customers from Mine No. 2 a total of 350,449.60 tons of coal for an aggregate amount of $582,581.05. This amount included all sums received for coal sold at the tipple of the mine, at the silos and at the storage plants.

"The total expenses incurred by petitioner during 1934 in connection with Mine No. 2, including wages, supplies, repairs, explosives, insurance, depreciation upon its plant and equipment, and other expenses in connection with cleaning, breaking, sizing and loading coal, aggregated $442,420.98.

"Other expenses incurred by petitioner, as shown by the stipulation filed herein, amounted to $113,209.80. Included in this amount were items of general expense, aggregating $17,228.28, and expenses incurred by petitioner during the taxable year in connection with the operation of its silos and storage plant facilities, aggregating $33,300.65.

"The items of general expense were as follows:

| | |
|---|---|
| Interest paid on loans | $ 8,810.80 |
| Taxes, capital stock and franchise | 792.99 |
| Association dues and code assessment | 2,300.00 |
| Legal and professional fees | 4,130.00 |
| Bad debts | 1,194.49 |
| Total | $17,228.28 |

"The expenses incurred by petitioner in connection with the operation of its silos and storage plant were as follows:

| | |
|---|---|
| Wages | $12,600.47 |
| Supplies and repairs | 751.08 |
| Insurance—Compensation and General | 431.52 |
| Freight and hauling—coal shipments received. (This figure includes the amount of $9,831.15 referred to above as being paid for freight charges in hauling of coal from Mine No. 2 to the silo.) (See paragraph 4 of Stipulation) | 15,487.16 |
| Depreciation—silo | 1,661.10 |
| Miscellaneous supplies and expenses | 2,369.32 |
| Total | $33,300.65 |

"Respondent computed petitioner's allowable depreciation as follows:

| | | |
|---|---|---|
| Net profit from mining | | $31,255.87 |
| Loss from selling department, including taxes paid on undeveloped land | $5,454.99 | |
| Less taxes paid on undeveloped land | 1,473.41 | 3,981.58 |
| Revised net income from property before depletion | | 27,274.29 |
| Depletion allowable 50% of $27,274.29 | | $13,637.15 |
| Depletion deducted on return | | 29,354.41 |
| Depletion disallowed | | $15,717.26 |

"Petitioner computes its allowable depletion as shown in the following schedules:

"First Method.

| | | |
|---|---|---|
| Gross income from property | | $582,581.05 |
| Deduct total expenses | $555,630.68 | |
| Except interest on loans, taxes, dues, legal expenses, etc. (See schedule above) | 17,228.28 | 538,402.40 |
| Net income from the property | | $ 44,178.65 |

"Second Method.

| | | |
|---|---|---|
| Gross income from property | | $582,581.05 |
| Deduct total expenses | $555,630.68 | |
| Except the expenses of operating the silos | 33,300.65 | 522,330.03 |
| Net income from the property | | $ 60,251.02 |

"Pointing out that 5 percent of the gross income is $29,129.05, it [the taxpayer] contends that its net income from the property for the purpose of computing its allowable depletion is $104,429.67, $60,251.02 or $44,178.65. Fifty percent of either of the first two amounts being in excess of the amount claimed in its return, it contends that the amount claimed should be allowed as a deduction. Its alternative contention is that in any event it is entitled to depletion of $22,089.37 or 50 percent of its net income, of $44,178.65 computed by the first method shown above."

The opinion of the Board was entered June 15, 1940, and is unreported. The Board held that the taxpayer was not entitled to exclude either of the sums in question ($17,228.28, representing general expense, and $33,300.65, representing the silo expense) in computing its net income from the property for the purpose of arriving at its depletion allowance. It was of opinion that the taxpayer was engaged in but one activity, "producing, cleaning, breaking, sizing and loading coal for shipment and sale," and that "the expense of $33,300.65 incurred by petitioner in operating its silos and storage plant, was attributable to its business of mining and selling coal."

On review in this court the taxpayer contends (1) that the Board was in error in concluding that the taxpayer was engaged in but the one business ("producing, cleaning, breaking, sizing and loading coal for shipment and sale") and argues that the operations of taxpayer's silos and storage plants ought to be deemed separate and distinct activities and that the expenses incurred in connection with their operation should not be charged against the income of the mine property for the purpose of arriving at net income for depletion purposes. It also contends (2) that some part of the expenses which it incurred for salaries of officers and clerical force, office rent, legal and professional fees, association dues and code assessment, discounts on sales, depreciation, automobiles and furniture fixtures, other ordinary and necessary expenses, taxes, capital stock and franchises, and interest paid on loans, notes, etc., aggregating $58,169.52, ought to have been allocated by the Board to some activities of the taxpayer other than the mining from which its gross income of $582,581.05 was produced.

(1) In support of the first contention the petitioner relies upon Consumers Natural Gas Co. v. Com'r, 2 Cir., 78 F.2d 161; Greensboro Gas Co. v. Com'r, 3 Cir., 79 F.2d 701.

In Consumers Natural Gas Company, supra, the taxpayer owned a natural gas well from which it supplied consumers in two villages from one to five miles away and the question was whether the statute fixing depreciation allowance on gas wells on the basis of a stated percentage of gross income from the "property" meant the income at the well or the income from the gas at the point of sale to the consumers. The court [78 F.2d 163] held that the intended basis was "income from the wells, not from the oil or gas after it has been carried through perhaps many miles of piping." The Third Circuit Court of Appeals reached the same conclusion upon similar facts in Greensboro Gas Company v. Commissioner, supra.

But we are not persuaded that the decision of the Board of Tax Appeals in this case is in conflict with those of the Second and Third Circuits relied upon. There was a sound basis in those cases to distinguish between the producing of gas from a natural gas well as one activity and the transportation and delivery of the gas

"through * * * perhaps many miles of piping" to consumers in the villages as another. But a coal mine in operation implies as a usual and customary incident some kind of a plant for the extraction of the coal and making it accessible for transportation. The addition of the silos and storage to the mine tipple of the taxpayer effecting more continuous service and larger volume of output can scarcely be said to have changed the nature of the mining or to have split what was concededly one activity into two. We do not find error to justify reversal in the Board's conclusion that "the petitioner was engaged in but one activity" in the tax year.

■■■■■ (2) Neither do we find ground for reversal in the contention that the Board erroneously failed to make allocation of "some part" of the taxpayer's enumerated items of expense to "properties, processes and activities owned and operated" by the taxpayer other than the mining which produced the gross income. The testimony which was taken before the Board has not been included in the record and it is evident that the taxpayer did not make the point now contended for before the Board. The taxpayer's contention there was that particular items of the general expense aggregating $17,228.28 should be eliminated or excluded from its cost of operation or expenses in computing its net income from the property for the purpose of the depletion allowance. The new point now raised before us is predicated largely upon paragraph 11 of a stipulation which was in evidence before the Board. It was there stipulated that there were items of disbursements aggregating $58,169.52 "deductions allowed to petitioner for the year 1934 in respect of selling, administrative and general expense which cannot be directly attributed to any specific property, activity or process". But as far as the record before us shows Mine No. 2 was the only property as to which any substantial operations were carried on by the taxpayer during the year 1934. The gross income from taxpayer's Mine No. 2 was that derived from the sale of coal from that mine and the net income from the property after deduction for depletion ($13,637.-14) was substantially the net income of the petitioner ($13,917.78). The gross income from the property was $582,581.05, and the net income according to the Commissioner's computation was $27,274.29. In addition to the net income from this property, Mine No. 2 with its silos, there was also a small coal jobbing business wherein the Company bought coal from other mines for $4,542.69 and sold it for $4,908.81, thereby clearing a profit of $366.12. The company claims that the record discloses an additional income amounting to $4,579.12 "from other sources". The company arrives at this income not otherwise accounted for by subtracting the income from the mineral property of Mine No. 2 from the total income. It also calls attention to paragraph No. 1 of the stipulation, which reveals that it owned real estate and personal property other than Mine No. 2 and paid taxes thereon in 1934. But all this does not show error for which the Board should be reversed. For a taxpayer to avoid a tax he must at least show that the Commissioner was wrong and the tax was arbitrary and excessive. See Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Clements v. Commissioner, 8 Cir., 88 F.2d 791. To reverse the Board of Tax Appeals because of an error not called to its attention, a miscarriage of justice must appear. Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037.

■■■■■ If we assume that allocation of expenses should have been made for the profit of $336.12, which was secured by the taxpayer through an expenditure of $4,542.-69, the allocation appears very small beside a profit of $27,274.29 secured at the expense of $555,306.76, and failure to make the allocation is de minimis rather than the type of injustice for which the Board will be reversed on an issue not called to its attention. It is still the general rule of appellate practice and review in tax matters that issues not raised in the first instance will not be heard upon appeal. Hormel v. Helvering, supra. The income of the taxpayer from sources other than this jobbing and Mine No. 2 stands on a different ground in this appeal, because as to it the Commissioner is not shown to have been even in prima facie error. Evidence which was before the Board but which is not in the record before us may have demonstrated that the expenses stipulated in No. 11 of the stipulation had no relation to this profit, and that the Board's action in making no allocation of those expenses was fair and proper. There is no record evidence of any activity or process by which the taxpayer may have gained this profit. There is record evidence that the taxpayer owned other real property and two other mines, Mine No. 1, which had been previously abandoned, and Mine No. 3 which was not operated during the tax year. It is quite possible that the profit not traced to its source arose from the

sale of coal mined prior to the tax year from Mine No. 3. If that was the fact, no apportionment of expense not "directly attributable to any specific activity" was necessary as that mine in the taxable year had no operating expenses and no production, which provide the ratio and the relation for the apportionment according to the regulation. Reg. 86, 1934, 23(m) 1(h). Maintenance of Mine No. 3 may have figured in the costs of overhead and officers' salaries and in the other items of Stipulation paragraph 11, but this is not the criterion of the regulation, which provides for allocation in proportion to operation and production. The taxpayer relies upon that regulation to prove the Commissioner's and the Board's error, but since we do not find facts in the record to justify belief that expenses should have been allocated to this unknown activity or process or property, we must consider that the expenditures were fairly considered by the Board and that its holding in respect to them was in accord with the statute and the applicable regulation. Both points urged by petitioner are accordingly ruled against it.

Affirmed.