## ST. LOUIS, ROCKY MOUNTAIN AND PACIFIC COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57507.    Filed April 15, 1957.

*Floyd K. Haskell, Esq.*, for the petitioner.
*Richard C. McLaughlin, Esq.*, for the respondent.

#### OPINION.

WITHEY, *Judge:* The respondent determined deficiencies in petitioner's income tax for the indicated years as follows:

| Year | Deficiency |
| --- | --- |
| 1951 | $5, 571. 96 |
| 1952 | 19, 276. 85 |

The issues presented by the pleadings and not disposed of by stipulation are the correctness of the respondent's action (1) in determining that premiums paid by petitioner to its bondholders for the repurchase of its first mortgage bonds during 1951 and 1952 and the amount paid to the trustee under bond indenture during 1952 are deductions which must be allocated between income from mining operations and other income in determining the net income limitation under section 114 (b) (4) of the Internal Revenue Code of 1939 for the purpose of computing petitioner's coal depletion allowance, and (2) in determining that a payment in the amount of $40,590.09 made to petitioner by the Continental Oil Company in 1952 was not subject to depletion under section 114 (b) (3) of the 1939 Code.

All of the facts have been stipulated and are found accordingly.

Petitioner (sometimes hereinafter referred to as St. Louis) is a corporation organized under the laws of the State of New Mexico, with its principal office located in Raton, New Mexico. During the years in issue, and for many years prior thereto, St. Louis was engaged in the production of coal.

Petitioner's income tax returns for 1951 and 1952 were filed with the director of internal revenue for the district of New Mexico at Albuquerque, New Mexico. Petitioner kept its books and prepared its income tax returns on an accrual basis of accounting.

Petitioner's production of coal reached a peak at the close of World War I and has subsequently declined, with the exception of a temporary increase during World War II. The decrease in its coal production was due in large part to the advent of more economical sources of fuel.

During the years 1918 to 1952, St. Louis did not acquire any new coal-producing properties. During those years it had more cash available than was required for its normal operations. Accordingly, petitioner's directors decided to adjust its capital structure.

On November 29, 1937, petitioner was authorized by its stockholders to write down its property account in the amount of $1,500,000 and to reduce the par value of its common stock from $25 per share to $10 per share, thereby reducing its common stock account from $2,500,000 to $1,000,000.

Petitioner's board of directors revalued its properties in December 1937 and decided that a consolidation of its capital structure was desirable in view of the economic conditions affecting the industry.

Consequently, to accelerate the release of its properties from a mortgage lien, petitioner commenced the repurchase of its outstanding 5 per cent first mortgage bonds maturing July 1, 1955. The bonds were redeemable at par on that date. The number of bonds purchased during the indicated years and the resulting discount income or premiums were as follows:

| Year | Number of bonds | Par value | (Discount) or premium | Purchase price of bonds | Accrued interest paid upon purchase |
|---|---|---|---|---|---|
| 1936 | 218 | $218,000 | ($34,585.00) | $183,415.00 | $266.39 |
| 1937 | 136 | 136,000 | (24,651.25) | 111,348.75 | 3,291.69 |
| 1938 | 227 | 227,000 | (93,915.00) | 133,085.00 | 5,488.61 |
| 1939 | 45 | 45,000 | (17,995.00) | 27,005.00 | 737.22 |
| 1940 | 23 | 23,000 | (12,393.75) | 10,606.25 | 392.92 |
| 1941 | 249 | 249,000 | (138,867.38) | 110,132.62 | 460.12 |
| 1942 | 191 | 191,000 | (57,107.50) | 133,892.50 | 4,181.73 |
| 1943 | 172 | 172,000 | (36,130.97) | 135,869.03 | 2,125.52 |
| 1944 | 98 | 98,000 | (6,375.00) | 91,625.00 | 1,069.16 |
| 1945 | 126 | 126,000 | (2,251.50) | 123,748.50 | 1,435.13 |
| 1946 | 20 | 20,000 | | 20,000.00 | 347.22 |
| 1947 | 18 | 18,000 | | 18,000.00 | 318.89 |
| 1948 | 55 | 55,000 | | 55,000.00 | 915.00 |
| 1949 | 55 | 55,000 | | 55,000.00 | 7,837.19 |
| 1950 | 535 | 535,000 | 33,883.00 | 568,883.00 | 9,742.20 |
| 1951 | 277 | 277,000 | 17,280.28 | 294,280.28 | 3,807.77 |
| 1952 | 237 | 237,000 | 36,270.10 | 273,270.10 | 1,417.94 |

In 1941, petitioner began to repurchase its 5 per cent noncumulative, $100-par-value preferred stock. The stock was acquired during the indicated years in the amounts and for the prices as follows:

| Year purchased | No. of shares | Cost |
|---|---|---|
| 1936–1940 | (1) | (1) |
| 1941 | 4, 455 | $129, 909. 90 |
| 1942 | 335 | 5, 062. 50 |
| 1943 | 260 | 9, 912. 50 |
| 1944 | 500 | 30, 450. 00 |
| 1945 | 100 | 5, 800. 00 |
| 1946 | (1) | (1) |
| 1947 | 755 | 60, 345. 80 |
| 1948 | 1, 000 | 83, 077. 20 |
| 1949 | 46 | 3, 680. 00 |
| 1950 | 7 | 525. 00 |
| 1951 | 5 | 350. 00 |
| 1952 | 140 | 11, 200. 00 |

1 None.

The aforementioned 5 per cent first mortgage bonds of petitioner were its only bonds. No additional bonds were issued prior to 1953.

As of June 30, 1952, 214 of petitioner's bonds were still outstanding and could not be repurchased either because the bondholders refused to sell or could not be located. In July 1952, petitioner paid to a trustee under bond indenture $214,000, the principal amount of the remaining bonds outstanding, together with an amount ($32,100) equal to the interest on the bonds from July 1, 1952, through July 1, 1955, the maturity date of the bonds. Upon receipt of the foregoing payment, the trustee for the bondholders gave petitioner a release and satisfaction of its mortgage.

During the last 6 months of 1952, the trustee succeeded in acquiring 114 of the 214 outstanding bonds in consideration for payment of the principal amount ($114,000), together with interest thereon from July 1, 1952, to July 1, 1955, in the amount of $17,100. On December 31, 1952, 100 bonds were outstanding and the trustee therefore retained an amount equal to the principal of the bonds ($100,000), plus an amount representing interest thereon from July 1, 1952, to July 1, 1955 ($15,000).

On its income tax return for 1952, petitioner treated the $15,000, representing interest paid to the trustee, as premium and allocated no part thereof to mining operations for the purpose of computing its depletion allowance, but treated the $17,100 paid by the trustee to the bondholders upon repurchase of petitioner's securities as interest expense allocable between mining operations and other activities.

In its income tax returns for 1936, 1937, and 1938, petitioner had treated the discount income received upon the repurchase of its bonds as a reduction of overhead expenses allocable for depletion purposes between mining operations and other activities. Upon examination

of the foregoing returns, the respondent determined that this treatment was improper and that the discount income realized by petitioner on the repurchase of its bonds should be treated as income from activities other than mining operations. The petitioner accepted the respondent's determination as to the treatment of discount income and consequently treated discount realized on the repurchase of its bonds in subsequent years entirely as other income. Accordingly, when petitioner sustained losses upon the repurchase of its bonds in 1950, 1951, and 1952, it treated these losses or premium expenses as expenses not allocable in any part to mining operations.

The cost of issuance and bond discount expense incurred at the time the bonds were issued in 1905 were amortized over the years 1905 to 1950 and were treated by petitioner as overhead expenses allocable between mining operations and other activities for purposes of computing its depletion deduction. The foregoing issuance and discount expenses were incurred solely in connection with bonds repurchased prior to 1951, and did not relate to the bonds repurchased in 1951 and 1952.

On its income tax return for 1951, petitioner, in computing its coal depletion allowance, treated bond premiums in the amount of $17,280.28 as a direct charge against other income. Similarly, on its income tax return for 1952, it treated bond premiums in the amount of $36,270.10 as chargeable entirely against other income for depletion purposes.

During the years in issue, petitioner realized income in the amounts and from the sources as follows:

*1951*

| | |
|---|---:|
| Gross sales from mining | $3, 529, 795. 41 |
| Sales of Coke Breeze | 29, 381. 09 |
| Timber | 1, 860. 53 |
| Dividends | 60. 00 |
| Interest on loans, mortgages, bank deposits, etc | 66. 03 |
| Interest on corporation bonds | 7, 965. 81 |
| Rents | 79, 421. 38 |
| Exchange of warrants | 113. 94 |
| Sale of scrap | 760. 50 |
| Bad debt recovery | 1, 086. 41 |

*1952*

| | |
|---|---:|
| Gross sales from mining | 3, 671, 377. 49 |
| Sales of Coke Breeze | 22, 783. 22 |
| Dividends | 80. 00 |
| Interest on loans, mortgages, bank deposits, etc | 1, 069. 54 |
| Interest on corporation bonds | 5, 680. 74 |
| Rents | 76, 701. 33 |
| Royalties | 2, 643. 06 |
| Sale of tractor and crane boom | 880. 00 |
| Payment received under oil exploratory lease | 40, 590. 09 |
| Salvage | 105. 00 |

Petitioner elected to have its coal depletion allowance computed on the percentage basis under the provisions of section 114 (b) (4) of the 1939 Code for each of the years 1951 and 1952.

The respondent determined that the premiums in the amounts of $17,280.28 and $36,270.10 paid by petitioner to its bondholders for the repurchase of its bonds during 1951 and 1952, respectively, and the total interest in the amount of $32,100 paid to the trustee during 1952 must be apportioned between income from mining operations and other income in the computation of petitioner's allowance for depletion, thereby reducing the net income from the mining property and the depletion deduction allowable thereon.

Section 114 (b) (4) of the Internal Revenue Code of 1939 [1] provides for a coal depletion allowance in the amount of 10 per cent of the gross income realized from the coal property provided the allowance does not exceed 50 per cent of the net income from the property (computed without allowance for depletion). The question here presented is whether an allocated portion of the bond premium paid by petitioner and the interest paid to the trustee under bond indenture during the years in issue must be deducted from the gross income resulting from the coal property in computing net income under section 114 (b) (4) (A) of the 1939 Code for purposes of determining the 50 per cent net income limitation on the amount deductible as petitioner's allowance for percentage depletion. No issue is raised by the parties with respect to whether expenditures referred to herein are losses or expense items and we do not here consider that question.

The regulations [2] promulgated by the respondent under section 114 (b) (4) of the Code require that the gross income from the prop-

---

[1] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

  (b) BASIS FOR DEPLETION.—

       \*        \*        \*        \*        \*        \*        \*

    (4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

      (A) In General.—The allowance for depletion under section 23 (m) in the case of the following mines and other natural deposits shall be—

       \*        \*        \*        \*        \*        \*        \*

      (ii) in the case of coal \* \* \* 10 per centum.

       \*        \*        \*        \*        \*        \*        \*

  of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph.

[2] Regulations 118.

SEC. 39.23 (m)–1 *Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements.*

  (g) "Net income of the taxpayer (computed without allowance for depletion) from the property," as used in section 114 (b) (2), (3), and (4) and section 39.23 (m)–1 to 39.23 (m)–19, inclusive, means the "gross income from the property," as defined in paragraph (e) of this section, less the allowable deductions attributable to the mineral property upon which the depletion is claimed and the allowable deductions attributable to the processes listed in

erty be reduced by the amount of allowable deductions attributable to the mineral property upon which depletion is claimed. The regulations further provide that deductions not directly attributable to particular mineral properties or processes shall be fairly allocated, and the allocation of deductions not directly attributable to any specific activity shall take into account the ratio which the deductions directly attributable to the mineral property bear to the deductions attributable to the additional activities.

The respondent maintains that the premiums paid by petitioner to its bondholders upon the repurchase of its bonds during 1951 and 1952 and the $32,100 amount paid to the trustee in 1952 are deductions which are not directly attributable to particular mineral properties or processes and which cannot be attributed to any specific activity and therefore must be allocated between gross income from the mining property and other income in computing petitioner's net income, thereby reducing the 50 per cent of net income limitation on the amount deductible as its allowance for depletion.

The petitioner does not question the validity of the foregoing regulations but contends that the premiums paid for the repurchase of its bonds prior to maturity are expenses attributable to an activity separate from its mining operations, i. e., the activity of repurchasing its outstanding bonds, and are in no part allocable to the income from its mining property for the purposes of computing the foregoing net income limitation under section 114 (b) (4) (A) of the 1939 Code. Petitioner therefore maintains that the aforementioned expenses are chargeable entirely against other income for depletion purposes.

The parties are in agreement as to the proper method of allocation to be employed, provided the expenses in question are properly allocable among petitioner's income-producing activities pursuant to the regulations issued by the respondent.

We are aware of no previous decision controlling the issue here presented.

---

paragraph (f) of this section in so far as they relate to the product of such property, including overhead and operating expenses, development costs properly charged to expense or allowable as deductions under section 23 (cc), depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion. Deductions not directly attributable to particular properties or processes shall be fairly allocated. To illustrate : In cases where the taxpayer engages in activities in addition to mineral extraction and to the processes listed in paragraph (f) of this section, deductions for depreciation, taxes, general expenses, and overhead, which cannot be directly attributed to any specific activity, shall be fairly apportioned between (1) the mineral extraction and the processes listed in paragraph (f) of this section and (2) the additional activities, taking into account the ratio which the operating expenses directly attributable to the mineral extraction and the processes listed in paragraph (f) of this section bear to the operating expenses directly attributable to the additional activities. If more than one mineral property is involved, the deductions apportioned to the mineral extraction and the processes listed in paragraph (f) of this section shall, in turn, be fairly apportioned to the several properties, taking into account their relative production.

In a prior decision construing the provisions of section 114 (b) (4) of the Code, we have held that interest paid on money borrowed for construction purposes is attributable to the depletable property involved. *Guanacevi Mining Co.*, 43 B. T. A. 517, affd. 127 F. 2d 49. Moreover, interest paid on money borrowed to purchase property for the production of oil and gas likewise has been held to be deductible from gross income in computing net income for depletion purposes. *St. Mary's Oil & Gas Co.*, 42 B. T. A. 270.

In *Sheridan-Wyoming Coal Co.* v. *Helvering*, 125 F. 2d 42, affirming a Memorandum Opinion of this Court, the United States Court of Appeals for the District of Columbia held that interest on the taxpayer's outstanding bonds, amortizable issuance expense, and bond discount expense incurred at the time the bonds were issued were deductible items in determining net income for purposes of computing the limitation on depletion under section 114 (b) (4) of the Revenue Act of 1934, a provision identical in effect to section 114 (b) (4) (A) of the 1939 Code.

Under the provisions of the Code here applicable, we are unable to discern a material difference in the treatment to be accorded bond interest, bond discount, issuance expense, and bond premium expense. Although the bond interest, bond discount, and the cost of issuance, which were involved in *Sheridan-Wyoming Coal Co.* v. *Helvering*, *supra*, were incurred as expenses of acquiring initial capital, the bond premiums here in question were expenditures made for the purpose of realigning the capital structure and bear a direct relation to all the business activities of the corporation and to the income derived therefrom. Consequently, such premiums are properly deductible from gross income under either section 23 (a) or section 23 (e) of the 1939 Code in determining net taxable income.

By the issuance of bonds, the petitioner obtained funds for use in its business operations. Although the record does not disclose the use of the proceeds of the bonds here in question, presumably the funds so obtained were available for use in all the income-producing activities of petitioner. The cost of acquiring the debt capital was amortized over a period of years prior to 1951 and in determining the net income limitation for depletion purposes it was allocated by petitioner between income resulting from mining operations and other income.

The withdrawal from capital of corporate funds for the repurchase of bonds likewise affects all of petitioner's activities. Accordingly, the cost of reducing its capital surplus and bonded indebtedness, thereby consolidating the corporate structure, is not directly attributable to any single income-producing activity.

Petitioner insists, however, that the bond premiums here in issue are attributable to a single and separate activity conducted by it, i. e.,

the financial activity commenced in 1936 of repurchasing its outstanding bonds, and that such expense is not chargeable to mining activities but is chargeable entirely against other income.

The program of repurchasing its outstanding bonds was not initiated by petitioner as an income-producing activity, but was commenced for the purpose of consolidating its financial structure. The receipt of discount income was an incidental result and not the purpose of the program. Consequently, we are of the opinion that the buying up of petitioner's outstanding bonds was not an "activity" as that term is used in section 39.23 (m)–1 (g) of respondent's regulations.

The "other income" (i. e., other than mining income) received by petitioner during 1951 and 1952, against which it contends the bond premiums should be charged, consists of rents, royalties, amounts received from an oil exploratory lease, dividends, interest, proceeds from the sale of timber and the sale of scrap, and a bad debt recovery. It is clear that the realization of income from the foregoing sources is not peculiarly affected by the payment of bond premium or the reduction in petitioner's debt capital. In fact, the amount of other income derived from most of the aforementioned sources is fixed by factors wholly apart from the retirement of bonded indebtedness. Accordingly, the bond premiums in question are not entirely attributable to petitioner's nonmining activities, as it here contends, but are rather deductible items which cannot be attributed entirely to any particular activity and must be fairly apportioned between mining income and other income in accordance with respondent's regulations in computing the net income limitation for depletion purposes under section 114 (b) (4) (A) of the 1939 Code.

As of July 1, 1952, petitioner was under obligation to pay at maturity the face amount of its outstanding bonds, together with interest at the rate of 5 per cent per year until the maturity date.[3] Petitioner discharged this obligation by payment to the trustee under the bond indenture of the par value of the outstanding bonds ($214,000), together with $32,100 representing interest on the bonds from July 1, 1952, to July 1, 1955.

On its income tax return for 1952 petitioner treated $17,100 of the aforementioned $32,100 amount as a deduction allocable between mining income and income from its other activities and the remaining $15,000 as attributable entirely to income from activities other than mining. Pursuant to an amendment to its petition filed at the hearing, petitioner now asserts that the entire amount of $32,100 paid

---

[3] No issue is raised here by either party with respect to the year in which these expenditures would be properly deductible to an accrual basis taxpayer. Cf. *B. F. Goodrich Co.*, 1 T. C. 1098.

by it to the trustee during July 1952 is allocable entirely to income from its other activities for purposes of computing the 50 per cent net income limitation on its depletion allowance. We are convinced from the record herein, however, that the $32,100 payment was essentially a prepayment of interest on the outstanding bonds and as such is attributable in part to petitioner's mining operations and must be allocated among all of its income-producing activities in computing the net income limitation on depletion. Cf. *Sheridan-Wyoming Coal Co.* v. *Helvering, supra; Guanacevi Mining Co., supra;* and *St. Mary's Oil & Gas Co., supra.*

The respondent concedes on brief that the petitioner is entitled to depletion under section 114 (b) (3) of the 1939 Code based upon the $40,590.09 amount received by petitioner from the Continental Oil Company during 1952.

*Decision will be entered under Rule 50.*