ISLAND CREEK COAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91431. Filed November 27, 1964.

*Frederic A. MacDonald,* for the petitioner.
*John J. Larkin,* for the respondent.

OPINION

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's income tax for the taxable years 1957 and 1958 in the respective amounts of $406,785.44 and $260,792.69.

The parties have agreed as to the disposition of all issues raised in the pleadings except for one.

The sole issue remaining for decision is whether petitioner, engaged in the business of mining coal, must deduct the amounts of $76,840 and $53,086, representing premiums paid for business interruption fire insurance coverage in the respective years 1957 and 1958, in determining its taxable income from its property to compute the allowable deductions for percentage depletion under section 613 of the Internal Revenue Code of 1954.

The facts have been stipulated and are found accordingly.

Petitioner is a Maine corporation with its principal office in Huntington, W. Va. It filed its Federal income tax return for the calendar year 1957 with the district director of internal revenue, Boston, Mass., and it filed its Federal income tax return for the calendar year 1958 with the district director of internal revenue, Parkersburg, W. Va.

During the years in issue petitioner owned and operated a number of bituminous coal mines in West Virginia, Virginia, and Kentucky.

These mines consisted of underground mine workings and other mining facilities, including a structure on the surface for screening and cleaning the coal and for loading the coal into railroad cars for shipment. These structures are known in the industry as preparation plants.

On June 1, 1956, petitioner acquired business interruption fire insurance covering its preparation plants. This coverage was in the form of identical endorsements on a number of blanket fire insurance policies issued by various fire insurance companies. One endorsement, similar in form and substance to the others issued by the participating insurance companies, provided as follows:

1. Subject to all its provisions and stipulations, this policy covers only the use and occupancy of the property occupied by the Insured as Coal Mining Property (formerly owned by the Red Jacket Coal Corporation) and situate in Mingo and Wyoming Counties, West Virginia, and Buchanan County, Virginia.

2. If the building(s), structure(s), machinery, equipment or merchandise on the premises described (for stock see Sections 7, 8 and 9 and for commissary merchandise, see paragraph C of Section 11 of this form) be damaged or destroyed by the peril(s) insured against during the term of this policy and a necessary interruption of business directly results, this Company shall be liable for not exceeding the ACTUAL LOSS SUSTAINED by the Insured, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such described property as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, to wit:—

ITEM I. $333,570 On the net profit which is thereby prevented from being earned and such charges and other expenses, including vacation pay under contract and payroll expense of Group I employees, but excluding payroll expense of Group II employees, as must necessarily continue during the interruption of business, to the extent only that such charges and expenses would have been earned had no loss occurred.

This Item covers expense of necessary heat, light and power, the cost of which is prevented from being earned during the interruption of business.

Definition of Group I employees: Officers, executives, superintendents, foremen, engineers, chief electricians, office employees, employees required during an interruption of business for necessary ventilation, drainage and maintenance above or below ground.

\* \* \* \* \* . \* \*

6. EXPENSE TO REDUCE LOSS: This policy also covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy (except expense incurred to extinguish a fire), not exceeding, however, the amount by which the loss under this policy is thereby reduced. Such expenses shall not be subject to the application of the Contribution Clause.

The premiums paid by petitioner for the business interruption fire insurance amounted to $76,840 in 1957 and $53,086 in 1958.

On June 18, 1957, a fire occurred at petitioner's mines Nos. 9 and 12, resulting in damage to the preparation plants at these mines. There was a total loss of production at mine No. 9 for 23 working days and at mine No. 12 for 8 working days, and there was a partial loss of

production at mine No. 9 for 24 working days. Upon resumption of full production at mine No. 9 after 47 working days, the coal mined and prepared at that mine was substantially the same as it had been prior to the fire. However, although full production at mine No. 12 was resumed after 8 working days, petitioner lacked adequate cleaning facilities to prepare the coal produced at this mine, and there was a consequent loss of realization on the coal produced at this mine due to the fact that petitioner could not obtain the same price for its coal produced at this mine over temporary facilities after the fire equal to the selling price which it could have realized if the fire had not damaged the preparation plant. Also, petitioner incurred expenses in constructing temporary facilities in order to minimize its losses due to the fire.

The business interruption insurance coverage extended to these items, and after investigation by an insurance adjuster, the insurer (insurers) made payments to petitioner under the business interruption insurance aggregating $332,229.76 because of the losses due to the fire damage to the preparation plants.

The amount of $332,229.76 was comprised of the following:

(1) $62,548.62, representing loss of production at the two mines.

(2) $240,664.40, representing loss of realization on the production at mine No. 12, computed at $0.688 per ton on a production of 116,767 tons prior to November 1, 1957, plus $0.85 per ton on a production of 188,622 tons after November 1, 1957.

(3) $29,016.74, representing the additional expense incurred to construct temporary facilities to reduce the losses.

The amount received for loss of realization from the sale of coal produced at mine No. 12, in the amount of $240,664.40, was allocated approximately $126,144 to 1957 and $114,520 to 1958. In computing its deduction for percentage depletion in its returns for 1957 and 1958, petitioner included the amounts of $126,144 for 1957 and $114,520 for 1958 in gross income from mining, and it deducted the premiums paid in these years for business interruption insurance as expenses attributable to the mineral property [1] in arriving at taxable income.

Respondent determined that the foregoing amounts of insurance proceeds did not constitute gross income from mining for purposes of computing the deductions for percentage depletion. This determination was assigned as error by petitioner in its original petition. Petitioner now concedes, however, on the authority of *Guthrie* v.

---

[1] In the stipulation of facts, reference is made to "an expense attributable to the mineral property," although it appears from the notice of deficiency that petitioner had several mineral properties. Presumably premiums paid for the business interruption insurance were allocated among the properties to determine the percentage depletion deductions with respect to each. Respondent does not contend that any allocation so made was not correct.

*United States*, 323 F. 2d 142 (C.A. 6, 1963), that such insurance proceeds are not to be included in gross income from mining for purposes of computing the deductions for percentage depletion, but petitioner, by amendment to its petition, now contends that the premiums paid for the business interruption insurance, while properly deductible as general expenses, should not be deducted from gross income from mining in determining the "taxable income from the property" for purposes of computing allowable depletion.[2]

Under the provisions of sections 611 and 613, I.R.C. 1954,[3] the material provisions of which are set forth in the margin, petitioner, operating coal mines during the taxable years 1957 and 1958, is en-

---

[2] We cannot tell from the record whether the premiums in dispute were the entire premiums paid on the business interruption insurance, as indicated by the stipulation of facts, or were the premiums on only that portion of the policies pertaining to the coverage for estimated loss of realization, as stated by respondent in his brief. However, the briefs of both parties approach the problem as though we are concerned only with premiums paid to cover loss of realization, and we have approached the issue on that basis.

[3] SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.

SEC. 613. PERCENTAGE DEPLETION.

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * *

(b) PERCENTAGE DEPLETION RATES.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

* * * * * * *

(4) 10 percent—asbestos (if paragraph (2)(B) does not apply), brucite, coal, lignite, perlite, sodium chloride, and wollastonite.

* * * * * * *

(c) DEFINITION OF GROSS INCOME FROM PROPERTY.—For purposes of this section—

(1) GROSS INCOME FROM THE PROPERTY.—The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) MINING.—The term "mining" includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

* * * * * * *

(4) ORDINARY TREATMENT PROCESSES.—The term "ordinary treatment processes" includes the following:

(A) in the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment;

titled to deductions for percentage depletion for these years equal to 10 percent of its "gross income from the property," but limited to 50 percent of its "taxable income from the property." "Gross income from the property" is defined in the statute as "gross income from mining"; but "taxable income from the property" is not defined in the statute.

The present controversy is concerned with the computation of petitioner's "taxable income from the property" in each of the years 1957 and 1958 in order to arrive at the amounts of the percentage depletion deductions allowable. Specifically, the issue is whether petitioner must deduct the amounts it paid in the years 1957 and 1958 as premiums for business interruption fire insurance in computing its "taxable income from the property" in each of these taxable years in applying the 50-percent limitation.[4]

As noted above, the term "taxable income from the property" is not defined statutorily. That the term was intended to mean the same as the term "net income from the property," as used in section 114(b) of the 1939 Code, is clear from the report of the Committee on Ways and Means with regard to the enactment of section 613, I.R.C. 1954, wherein it is stated:

As used in section 613, the term "taxable income from the property" means the same as "net income from the property" in existing section 114(b)(3),(4)(A), and no substantive change is intended by the change in language. In computing taxable income from the property it is intended that there be taken into account all deductible items (other than depletion) including such items as administrative and financial overhead expenditures and taxes which, under sound accounting principles, are attributable to extraction or processes treated as mining. [H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A184 (1954).]

To the same effect is the report of the Committee on Finance of the Senate. See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 330 (1954).

The Commissioner has defined these terms in his regulations under both the 1939 Code and the 1954 Code, which for our purposes are similar in all material respects. Compare sec. 1.613–4, Income Tax Regs., with sec. 39.23(m)–1(g), Regs. 118, and sec. 29.23(m)–1(g), Regs. 111.

Section 1.613–4, Income Tax Regs., provides as follows:

The term "taxable income from the property (computed without allowance for depletion)" as used in section 613 and this part, means "gross income from the property" as defined in section 613(c) and § 1.613–3, less allowable deductions (excluding any deduction for depletion) which are attributable to the mineral property, including allowable deductions attributable to ordinary treatment

---

[4] It appears from a schedule attached to the notice of deficiency that, with respect to each of petitioner's "properties," allowable percentage depletion deductions were limited to 50 percent of "taxable income from the property."

processes and mining transportation, with respect to which depletion is claimed. These deductions include administrative and financial overhead, operating expenses, selling expenses, depreciation, taxes, losses sustained, etc. In the case of oil and gas properties, such deductions include intangible drilling and development costs deducted under section 263(c) and § 1.612–4.[1] In the case of a property other than an oil or gas property, such deductions include deductions which are attributable to processes and transportation treated as mining under section 613(c) and § 1.613–3 and amounts of exploration or development expenditures which are deducted for the taxable year under sections 615 and 616. Expenditures which may be attributable to both the mineral property upon which depletion is claimed and other activities shall be fairly apportioned. Furthermore, where a taxpayer has more than one mineral property, deductions not directly attributable to a specific mineral property shall be fairly apportioned among the several properties.

[1] In process of preparation.

The validity of these regulations has been recognized by the courts. *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90 (1939); *Sheridan-Wyoming Coal Co.* v. *Helvering*, 125 F. 2d 42 (C.A.D.C. 1941), affirming a Memorandum Opinion of this Court; *Elk Lick Coal Co.*, 23 T.C. 585 (1954).

While we have been referred to no authorities, and we are aware of none, dealing specifically with the question of whether a coal-mining operator must deduct premiums for business interruption insurance in computing "taxable income from the property," *Guthrie* v. *United States*, 323 F. 2d 142 (C.A. 6, 1963), holds directly that the proceeds from such insurance do not constitute gross income from mining subject to the percentage depletion allowance. Petitioner has conceded this point and that issue is not before us. However, it has been recognized that merely because the income from a transaction does not constitute "gross income from mining" it does not necessarily follow that expenses related thereto are not to be deducted in computing net or taxable income from the property for depletion purposes. See *Elk Lick Coal Co.*, *supra*, wherein this Court recognized that while gain from the sale of abandoned mining equipment might not be includable in gross income from mining, nevertheless, losses realized from the abandonment or scrapping of such equipment were deductible from gross income from mining in computing net income from the property. See also *Island Creek Coal Co.*, 30 T.C. 370, 384 (1958). We are thus not in a position to accept petitioner's argument that in the interest of justice (in the absence of compelling statutes and regulations to the contrary) petitioner should not be required to deduct the premiums paid for this insurance, thus reducing its taxable income from the property, while at the same time not being permitted to include the proceeds thereof in its gross income from mining for depletion purposes.

Petitioner's principal argument is that not every expense otherwise deductible in determining the taxpayer's income for all tax purposes

must be deducted in determining taxpayer's taxable income for depletion purposes, and that an expense is a deduction attributable to a mineral property, within the meaning of the regulation, only if it directly or indirectly creates, benefits, or contributes to the gross income ultimately received *from the sale of the minerals produced by the property*. We agree with petitioner's first premise. See *F.H.E. Oil Co.*, 3 T.C. 13 (1944), affd. 147 F. 2d 1002 (C.A. 5, 1945), rehearing denied 149 F. 2d 238 (C.A. 5, 1945), second rehearing denied 150 F. 2d 857 (C.A. 5, 1945); *United States Potash Co.*, 29 T.C. 1071 (1958); and *Island Creek Coal Co., supra*, wherein this Court held that charitable contributions not directly related to the mining business are not to be deducted in computing net or taxable income from the property; and *United Salt Corporation*, 40 T.C. 359 (1963), on appeal (C.A. 5, Sept. 16, 1963), wherein we held that expenses related to activities beyond the cutoff point for determining gross income from mining (the cost of packaging) need not be deducted in determining net or taxable income from the property. But we believe that under the regulations and the decided cases the second premise upon which petitioner's argument is founded, as applied by petitioner to this case, limits the term "taxable income from the property" to a meaning less broad than the terminology itself implies and the interpretation thereof by the courts warrants.

The answer to the question posed here is not free from doubt, as is often the case with percentage depletion problems. As said by the Supreme Court in *Helvering* v .*Wilshire Oil Co., supra:*

In its general aspects under revenue acts depletion is a problem on which taxpayers, government and accountants have expressed a contrariety of opinions.[11] Obfuscation in attempted application of its principles under income tax laws has frequently been the result. [Footnote omitted.]

While the statute is silent on what expenses are deductible in arriving at taxable income from the property, the courts have generally applied the principle of the regulations that in determining taxable income from the property for depletion purposes all allowable deductions attributable to the mineral property, including those attributable to the ordinary treatment processes and mining transportation which are deemed to be mining, must be deducted from gross income from the property. The question is whether the premiums here involved are allowable deductions attributable to the mineral property or the ordinary treatment processes within the meaning of the regulation.

Petitioner contends that to be deductible the expense must either fall within one of the specific categories mentioned in the regulation, i.e., "administrative and financial overhead, operating expenses, selling expenses, depreciation, taxes, losses sustained," or be otherwise clearly

"attributable to the mineral property." Respondent contends that if the expenses are ordinary and necessary expenses of operating the mineral property they must be deducted. Our interpretation of the statute and the regulation is that first and foremost the expenses must be attributable to the mineral property to be deductible, and they may but need not necessarily fall within one of the categories specified in the regulations. We think it is clear that the categories specifically mentioned in the regulations were not intended to be all-inclusive, and we have so held. *St. Marys Oil & Gas Co.*, 42 B.T.A. 270 (1940).

Petitioner also contends that the expense must be an expense of mining and related to production. This contention finds support in the language used in some of the opinions in this and other courts wherein they have sought to determine whether the expense was a "mining cost," *American Gilsonite Co.*, 28 T.C. 194 (1957), affirmed on this issue 259 F. 2d 654 (C.A. 10, 1958), certiorari denied 359 U.S. 925; whether it was "directly related to the mining and preparation of coal," *Elk Lick Coal Co., supra;* whether the expense has "an immediate relation to the mining operations and production," *Mirabel Quicksilver Co.*, 41 B.T.A. 401 (1940) ; or whether the deduction was an "expense of mining," *Guanacevi Mining Co.*, 43 B.T.A. 517 (1941).

On the other hand it is clear from both the language of the regulation and from court decisions that to be deductible the expense need not be a direct expense of mining or production. Court decisions have required the deduction of such expenses as losses from the operation of a company town where low rentals were considered to be indirect wages, *American Gilsonite Co., supra;* apportioned share of premiums and interest paid on outstanding bonds although the taxpayer's purchase of its bonds had previously resulted in discount income which was not included in gross income from mining, *St. Louis, Rocky Mountain & Pacific Co.*, 28 T.C. 28; losses sustained on the abandonment of tipple and equipment although it was recognized that any income from the abandonment of such items would not constitute gross income from mining, *Elk Lick Coal Co., supra;* interest paid on a Federal income tax deficiency where the taxpayer had no business activity other than mining, *Holly Development Co.*, 44 B.T.A. 51 (1941) ; interest paid on money borrowed to purchase the producing property, *St. Marys Oil & Gas Co., supra;* State income taxes paid with respect to income produced by operation of the mineral property, *Grison Oil Corporation*, 42 B.T.A. 1117 (1940) ; expenses incurred in the taxable year in question in settling employees' silicosis claims for occupational diseases contracted in preceding years, *Montreal Mining Co.*, 41 B.T.A. 399 (1940) ; interest paid on money borrowed for mining equipment and development and capital stock taxes, *Mirabel Quicksilver Co., supra;* see *Guanacevi Mining Co., supra;* various State and Federal

taxes, *Montreal Mining Co.*, 2 T.C. 688 (1943), affirmed on this issue in an unreported opinion (C.A. 6, 1944, 33 A.F.T.R. 1660, 44–2 U.S.T.C. par. 9490) ; and expenses of operating storage facilities for coal processed at the tipple where gross income from mining was deemed to be the sales price of the coal when sold from the storage facilities, as well as legal fees, association dues, and bad debts, *Lumaghi Coal Co.* v. *Helvering*, 124 F. 2d 645 (C.A. 8, 1942).

We conclude from the above authorities that for expenses to be deductible from gross income from mining in computing taxable income from the property for depletion purposes they must be related directly or indirectly to the business of mining and producing coal from the mineral property through the mining stage, but that they need not be an expense directly incurred in the extraction and processing of the mineral, nor need they necessarily be limited to items that would be deducted in computing net operating profit from mining. Applying this rationale to the expenses here involved we must conclude that the premiums are to be deducted in computing taxable income from the property. They are a cost of operating the mineral property and producing and processing the coal extracted therefrom and are thus attributable to the mineral property.

Petitioner argues that all the petitioner bought with the insurance premiums was an assurance of a certain profit measured by the difference between the sales price of the coal unprocessed and the price that would have been obtained for this coal had the coal been processed through the tipple that was destroyed by the fire—and that the premium expense is not related directly or indirectly to the production of the coal which produced the gross income from mining and therefore should not reduce the taxable income from the property for depletion purposes. Were the "gross income from mining" and the "allowable deductions * * * which are attributable to the mineral property" necessarily interdependent this argument would have more weight. But as we have pointed out above, the authorities have not so interpreted the statute. An example of this occurred in the earlier *Island Creek Coal Co.* case, wherein this Court held that this taxpayer could not charge off its income from the sale of scrap against its "Supplies Maintenance" account before deducting the debit balance in its "Supplies Maintenance" account from gross income from the property to arrive at the net income limitation on its percentage depletion deduction.

Both the gross income from the property and the taxable income from the property are used in section 613 to compute a *deduction* for percentage depletion. We assume that petitioner has deducted the premiums here involved in computing its net taxable income for overall purposes and we see no particular injustice in requiring it to

reduce its "taxable income from the property" by these premiums just because the proceeds from the insurance are not includable in gross income from the property for depletion purposes, unless the statute and the regulations clearly indicate that a correlation of deductions attributable to the mineral property with gross income from the mineral property must be made. We find no such requirement in the statute, the regulations, or the decided cases. These premium expenses can hardly be said to be related solely to assurance of a profit on coal produced. We assume that the premiums are deducted from income as ordinary and necessary expenses of petitioner's business of mining coal in arriving at net taxable income in years when no proceeds from the policies are received.

Petitioner points to no activity other than its coal-producing business and to no other property other than the mineral properties which produced its gross income from mining to which these premium expenses could be attributable, so we must hold for respondent on this issue. See *Lumaghi Coal Co.* v. *Helvering, supra.*

*Decision will be entered under Rule 50.*