# DOUGLAS *v.* COMMISSIONER OF INTERNAL REVENUE.

**NOS. 130 AND 131.**

Argued March 7, 1944.—Decided May 15, 1944.

*Mr. Kimball B. DeVoy,* with whom *Messrs. James E. O'Brien* and *Thomas P. Helmey* were on the brief, for petitioners.

*Miss Helen R. Carloss,* with whom *Solicitor General Fahy, Assistant Attorney General Samuel O. Clark, Jr.,* and *Messrs. Sewall Key* and *Valentine Brookes* were on the brief, for respondent.

*Messrs. F. G. Davidson, Jr., Theodore L. Harrison, J. Donald Rawlings,* and *W. A. Sutherland* filed a brief on behalf of the Virginian Hotel and other taxpayers, as *amici curiae.*

MR. JUSTICE REED delivered the opinion of the Court.

The Commissioner of Internal Revenue assessed income tax deficiencies against the petitioners for the year 1937, because of their failure to include in income for that year sums required to be reported by the terms of Article 23 (m)–10 (c) of Treasury Regulations 94, issued pursuant to § 23 (m), Revenue Act of 1936.   The facts were not in dispute.   Bessie P. Douglas, the petitioner in Nos. 130 and 131, was in 1929 co-owner with Adeline R. Morse, Charles H. Robinson, and Irene B. Robinson Cirkler of an iron ore mine in St. Louis County, Minnesota, known as the Pettit mine.   The petitioners in No. 132 are the executors of the estate of Charles H. Robinson, and the petitioner in No. 133 is the transferee of the assets of the estate of Irene B. Robinson Cirkler, deceased.[1]   In 1929 its co-owners leased this mine to the Republic Steel Corporation.   The lease, as amended in 1933, ran for a term of thirty years, but the lessee was given the power to cancel it at the end of eight years.   The lessee undertook to pay a royalty of 40 cents a ton for the ore removed and guaranteed minimum royalties of $20,000 a year for the first five years and $40,000 a year thereafter, subject after

---

[1] Bessie P. Douglas owned a one-half interest; each of the other co-tenants owned a one-sixth interest.   The executor of the estate of Adeline R. Morse did not appeal from an adverse decision of the Board of Tax Appeals.

five years to the payment of $60,000 a year as a minimum during the time it failed to remove certain water from the mine. In case the guarantee required the lessee to pay in any one year for more ore than it actually removed, it was entitled to have the excess payment applied against removals in later years. The lessee paid the minimum royalties each year, but it removed no ore at all, and as of July 1, 1937, at the end of the eight-year period, it surrendered the lease. Each lessor took a proper depletion deduction in the respective years the royalties were paid, 1929 to 1936, inclusive. In the year 1933, Bessie P. Douglas claimed a depletion deduction of $4,958.05, but since she had sustained a net loss of $13,947.51, this deduction did not affect her tax liability. The Commissioner required all of the deductions to be taxed as income in 1937. The Board of Tax Appeals affirmed his conclusion, except as to the 1933 deductions by Bessie P. Douglas, which was reversed. 46 B. T. A. 943. Upon appeals by the taxpayers and, in No. 131, by the Commissioner, the Circuit Court of Appeals upheld the original assessments. 134 F. 2d 762. We granted petitions for writs of certiorari to settle a question reserved by our decision in *Herring* v. *Commissioner*, 293 U. S. 322, 328, as to cost depletion, and to consider an issue similar to that involved in *Dobson* v. *Commissioner*, 320 U. S. 489.

The Revenue Act of 1913, § II (G) (b), granted a deduction for depletion based solely on actual production and "not to exceed 5 per centum of the gross value at the mine of the output for the year." Under this Act, advance royalties were taxed without deduction for depletion. In 1916 Congress removed the 5% ceiling, but the deduction was still limited to the year of actual extraction. Revenue Act of 1916, § 5 (a) Eighth (b). The relevant parts of the depletion section reached substantially their present form in the Revenue Act of 1918, which, like the 1916 Act, authorized "a reasonable allow-

ance for depletion . . . under rules and regulations to be prescribed" with the approval of the Secretary of the Treasury; but the 1918 Act no longer limited the allowance to the product actually mined and sold during the year. The section now reads as follows:

"Sᴇᴄ. 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

. . . . .

"(m) Depletion.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. . . ." Revenue Act of 1936, c. 690, 49 Stat. 1648, 1658–60.

From the beginning of income taxation, as now, the regulations covered the conventional situations of payments for ores as mined and made provision for depletion measured by the volume actually extracted. The 1918 Act permitted the new regulations, Regulations 45, Article 215 (c), to provide for the first time a deduction in the year of receipt of advance royalties of a depletion allowance calculated on the unit value of the mineral in place. This met a frequently recurring variation from the normal lease. As a corollary the regulations required that in case a lease was surrendered before the lessee had extracted all the ore for which advance royalties had been

paid, a sum equal to the depletion allowance previously granted on such ore should be taxed as income in the year of the surrender of the lease. The bonus or advanced royalty regulations have remained practically unchanged since 1919.[2] The subsections applicable to prepaid royalties are as follows:

"ART. 23 (m)–10. Depletion—Adjustments of accounts based on bonus or advanced royalty

• • • • •

"(b) If the owner has leased a mineral property for a term of years with a requirement in the lease that the lessee shall extract and pay for, annually, a specified number of tons, or other agreed units of measurement, of such mineral, or shall pay, annually, a specified sum of money which shall be applied in payment of the purchase price or royalty per unit of such mineral whenever the same shall thereafter be extracted and removed from the leased premises, an amount equal to that part of the basis for depletion allocable to the number of units so paid for in advance of extraction will constitute an allowable deduction from the gross income of the year in which such payment or payments shall be made; but no deduction for depletion by the lessor shall be claimed or allowed in any subsequent year on account of the extraction or removal in such year of any mineral so paid for in advance and for which deduction has once been made.

"(c) If for any reason any such mineral lease expires or terminates or is abandoned before the mineral which

---

[2] In addition to Regulations 45, Article 215, the provision appeared thereafter in Regulations 62, Article 215, issued under § 214 (a) of the Revenue Act of 1921; Regulations 65 and 69, Article 216, issued under § 214 (a) of the Revenue Acts of 1924 and 1926; Regulations 74, Article 236, issued under § 23 (l) of the Revenue Act of 1928; Regulations 77, Article 230, issued under § 23 (l) of the Revenue Act of 1932; Regulations 86 and 94, Article 23 (m)–10, issued under § 23 (m) of the Revenue Acts of 1934 and 1936. They have remained unchanged under the Code, Regulations 111, § 29.23 (m)–10.

has been paid for in advance has been extracted and removed, the lessor shall adjust his capital account by restoring thereto the depletion deductions made in prior years on account of royalties on mineral paid for but not removed, and a corresponding amount must be returned as income for the year in which the lease expires, terminates, or is abandoned." Treasury Regulations 94, promulgated under the Revenue Act of 1936.

The deficiency here assessed falls squarely under the subsections. Their validity is therefore the decisive issue. In our opinion the regulations are valid.

Since the revenue acts have not forbidden recognition of bonus or advanced royalties as a basis for the calculation of appropriate depletion, the provision of the regulations for a depletion offset against their receipt is within the broad rule-making delegation of § 23 (m). Royalty or bonus payments in advance of actual extraction of minerals are, like sales after severance or royalty payments on actual production, gross income and not a recovery of capital. *Stratton's Independence* v. *Howbert*, 231 U. S. 399, 418; *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103, 114; *Burnet* v. *Harmel*, 287 U. S. 103; *Herring* v. *Commissioner*, 293 U. S. 322, 324. Cf. *Anderson* v. *Helvering*, 310 U. S. 404, 407–8. Any deduction from this income for depletion, of course, may be allowed upon such terms as Congress may deem advisable. *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, 366; *United States* v. *Ludey*, 274 U. S. 295, 302. Depletion based on cost is like depreciation. Congress has allowed a recovery of the capital invested in a mine but, except in discovery or percentage depletion in special instances which are not here involved, see § 114, allowed nothing beyond that investment. §§ 23 (m) and (n), 113, 114; 49 Stat. 1648, 1660, 1682–1687. Deduction is allowed for the exhaustion of the property—the ore mass. *Lynch* v. *Alworth-Stephens*

*Co.,* 267 U. S. 364, 370. It may be in step with extraction, where extraction and sale synchronize with payments for the ore or the deduction may be allowed against advance payments of royalties or bonus. The theory of depletion is the same in both cases. In either situation, the depletion deduction is allowed in the ore extracted or expected to be extracted. Regulations 45, Art. 23 (m)–2 and –10 (a) and (b). Thus the mine owner under Article 23 (m)–10 is compensated for the use of his mineral reserves in the production of gross income.

By the 1919 Regulations, the plan of restoring the sum of depletion deductions to capital and carrying a corresponding amount to income in the year of the termination of a lease without production was adopted instead of a permanent reduction of basis or a restoration of the depletion deductions to income for the years in which they were deducted. The Act—§ 23 (m)—did not specifically authorize this handling of unrealized depletion. By the terms of the section a reasonable allowance for depletion was required, "according to the peculiar conditions in each case." As Congress obviously could not foresee the multifarious circumstances which would involve questions of depletion, it delegated to the Commissioner the duty of making the regulations. Article 23 (m)–10 (c) was developed to take care of the type of situation where because of a lease's cancellation without extraction, the reason for allowing depletion disappeared. As no diminution occurred in the ore mass, no depletion was appropriate. Congress has enacted numerous revenue acts since that time and has seen no occasion to change the statutory delegation of authority to the Commissioner of Internal Revenue which is the basis of this long-standing regulation. This evidences that subsections 23 (m)–10 (b) and (c) are within the rule-making authority which was intended to be granted the Commis-

sioner. *National Lead Co.* v. *United States,* 252 U. S. 140, 145–46; *Murphy Oil Co.* v. *Burnet,* 287 U. S. 299, 307.

As no depletion of the ore mass occurred or can occur under the lease which produced the gross income, the issue is not whether the regulation gives a reasonable allowance for depletion when prepaid royalties are involved. That issue has been decided in favor of the validity of such allowances in other cases. *Herring* v. *Commissioner,* 293 U. S. 322; *Murphy Oil Co.* v. *Burnet,* 287 U. S. 299. The problem here is the validity of Article 23 (m)–10 (c) when the depletion for which a deduction has been previously allowed fails in the manner anticipated as a possibility at the time of deduction.

A. Petitioners attack the validity of the regulation on the ground that the restoration of the accumulated deductions to capital, i. e., the depletion basis, with a corresponding increase of the taxpayers' annual income for the year of the restoration, is contrary to the requirements of certain sections of the 1936 Act. §§ 23 (m), 114 (b) (1) and 113 (b) (1) (B). It is unnecessary to appraise the effect in other years of the antecedents of these sections. Petitioners urge that the depletion deductions which were the untaxed portion of the royalties paid in prior years were capital recoveries in those prior years which resulted in a statutory, permanent reduction of basis which cannot be restored to basis and hence cannot be treated as income for 1937. Petitioners point to § 23 (m), *supra,* p. 278, as providing for the deduction for depletion on payment of advance royalties. It is contended that §§ 114 (b) (1) and 113 (b) (1) (B)[3] supplement the statutory direction

---

[3] "SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

⁕   ⁕   ⁕   ⁕   ⁕

(b) Basis for depletion.—

(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided

of 23 (m) for depletion by requiring the permanent lowering of the basis to reflect the depletion which § 23 offers.[4] This, of course, is a contention that depletion for advance royalties is, as a matter of statute, not necessarily and inevitably tied to extraction, actual or prospective. Summarily expressed, it is that the depletion was permanent, not conditional, and not subject to recovery when it became clear that no minerals were to be extracted.

To accept these arguments as a sound interpretation of the meaning of these provisions, however, would put into § 23 (m) of the Act of 1936 a requirement for depletion against advance royalties which the words of § 114 do not import. We think the Government is correct in its argument that the adjustment of basis authorized by § 113 (b) (1) (A) includes a restoration of depletion to capital account (basis) under the words "or other items,

---

in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection. . . ."

"SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(b) Adjusted basis.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

(A) for expenditures, receipts, losses, or other items, properly chargeable to capital account, including taxes and other carrying charges on unimproved and unproductive real property, but no such adjustment shall be made for taxes or other carrying charges for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years;

(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent allowed (but not less than the amount allowable) under this Act or prior income tax laws. . . ."

[4] The second sentence of § 23 (m), relating to a change of estimate as to recoverable mineral, is said to indicate a legislative intention that the basis, once reduced, is not to be restored.

properly chargeable to capital account," when the termination of the lease without extraction of ore forces the reconsideration of depletion. Consequently, we hold that §§ 23 (m), 114 (b) (1) and 113 (b) (1) (B) do not affect the power of the Commissioner under § 23 (m) to restore to the basis the amounts previously deducted in accordance with Article 23 (m)–10 (b) of Regulations 94. The taxpayer who receives advance royalties receives a gross income but has no statutory right to depletion apart from actual or prospective extraction. To grant irrecoverable depletion in circumstances where cancellation of the lease occurs prior to extraction would sever depletion from extraction and, if no later extraction followed, deflect income into the capital account without any corresponding capital loss.

B. Petitioners vigorously press another argument against the validity of the regulations. This is that the separate annual instalments of untaxed royalties (prior depletion deductions), since these untaxed portions of the royalties were income for the prior years, may not be accumulated and taxed for 1937 because such treatment is fictional, distorts the 1937 income to petitioners' detriment, is unreasonable and violates §§ 23 (m), 41 and 42 of the Act. The latter two sections require the computation of income, net and gross, upon the basis of an annual accounting period and the inclusion of gross income in the year received by the taxpayer. The applicability of all three sections depends upon whether a sum equal to depletion deductions allowed in prior years may be treated as income for 1937. Petitioners deny that this may be done and rely for the soundness of their position upon the familiar principle of annual computation of income, "as the net result of all transactions within the year." *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, 365.

· It is true that the advanced royalties were income to the taxpayers for the respective years in which they were received. A certain portion of each of such payments was, however, properly deducted from this income for depletion under Article 23 (m)–10 (b). In accordance with our position and conclusion, as set out in the paragraphs under the preceding section A of this opinion, such deductions were not finally charged to basis but were tentatively so charged, subject to the contingency that there should occur under the lease an actual extraction of mineral units which would be allocable to the deduction. Under subsection (c) there was the further requirement that if the contingency failed, the suspended sums should fall into income in the year that the failure was manifested by the termination of the lease. It seems entirely proper for the Commissioner not only to provide for a reasonable allowance for depletion when advance royalties are paid but also to provide for the situation when the expected depletion did not take place. Annual deductions were made by the taxpayer from his income. These were allowed to compensate for the exhaustion of capital. An event occurred in 1937, the termination of the lease, which restored the deductions for depletion to income. This requirement is, we think, within the delegation of authority to the Commissioner. The power delegated to him to make regulations for depletion must necessarily include power to provide for situations where the anticipated depletion of the mineral mass does not occur.

The manner in which the Commissioner exercised that power by attributing the sums restored to basis to the 1937 income, rather than to the years 1929 to 1936, is not invalid as an arbitrary penalty or an improper attribution under the theory of an annual period for determination of income taxes. On the termination of the lease, the

lessee surrendered the right to extract without royalty the ore for which royalty had been prepaid. This surrender returned to the taxpayer in 1937 a legal right. Thereupon the taxpayer was in position to again sell the right to extract this ore or to mine that selfsame ore itself. The record does not show any valuation of this right which the lessee surrendered. The lessee paid for the right the amount attributed to the petitioners' income. Irrespective of the actual value of the right in 1937, it does not seem unfair for a general regulation to put this value on the right restored to the taxpayer in the year of its restoration. The decisions uphold the regulation. *Sneed* v. *Commissioner*, 119 F. 2d 767, 770–771; 121 F. 2d 725; *Lamont* v. *Commissioner*, 120 F. 2d 996; Grace M. Barnett, 39 B. T. A. 864.[5]

---

[5] Petitioner calls attention to Knapp *v.* Commissioner, 7 B. T. A. 790, and Cooper *v.* Commissioner, 7 B. T. A. 798, acquiesced in respectively by the Commission, Acq. VII–1 Cum. Bul. 17 and 7, June 30, 1928; Acquiescence withdrawn December 31, 1932, XI–2 Cum. Bul. 12, 14. Petitioners' point is that whatever may be the validity of the regulations, taxpayers should not have their depletion deductions, for the years when the Commissioner's acquiescence was in effect, carried to income in a later year. We agree that these decisions held invalid a regulation like Art. 23 (m)–10 (c) which includes in income for a taxable year deductions allowed in prior years. The effect of the Commissioner's acquiescence is uncertain. Cf. C. B. XIII–2–IV. During the period of acquiescence, the regulation continued in existence and was republished in the edition of December 1, 1931, approved February 15, 1929, of Regulations 74 under the Revenue Act of 1928, Art. 236 (c). This was prior to the decision in *Murphy Oil Co.* v. *Burnet*, 287 U. S. 299, 304, decided December 5, 1932, thought by petitioner to have brought about the withdrawal of the acquiescence. Acquiescence by the Commissioner in a Tax Court ruling followed by action which is inconsistent with the withdrawal of an affected regulation is not a sufficiently definite administrative practice to justify a judicial ruling against the regulation on the strength of the acquiescence. *Estate of Sanford* v. *Commissioner*, 308 U. S. 39, 49; *Higgins* v. *Smith*, 308 U. S. 473, 478.

The restoration of the right to petitioners in 1937 is analogous to the surrender of a leasehold, improved by the lessee, to the lessor. In such a case, the value of the improvements is income to the lessor at the time of the surrender. *Helvering* v. *Bruun*, 309 U. S. 461. Cf. *Maryland Casualty Co.* v. *United States*, 251 U. S. 342.

C. The last contention of petitioners for our consideration is that where depletion deductions were taken in years when no equivalent tax benefit resulted, the amount of the deduction which resulted in no tax benefit should not be attributed to the year of the surrender of the lease. This question arises only in No. 131. The Board of Tax Appeals refused to allow the addition to the 1937 income of the taxpayer of sums which represented the amount of deductions for depletion beyond amounts of deductions which offset income. The Circuit Court of Appeals reversed.

Upon this last point, the decision below in No. 131 is affirmed by an equally divided court. The members of this Court who join in the dissent do not reach this question but their position on other issues results in their voting for a reversal of the entire judgment of the Circuit Court of Appeals. Two other members of this Court are of the view that in No. 131 the judgment of the Circuit Court of Appeals should be reversed and that the decision of the Board of Tax Appeals should be affirmed.

In Nos. 130, 132 and 133, the foregoing leads us to the conclusion that the regulations are valid and the judgments of the Circuit Court of Appeals are

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE RUTLEDGE, dissenting:

In my opinion Article 23 (m)–10 (c) is not a reasonable exercise of the rule-making authority conferred by § 23.

By that section Congress provided: "In computing net income there *shall be* allowed as deductions . . . *a reasonable allowance* for depletion . . . according to the peculiar conditions in each case . . . under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary." Revenue Act of 1936, 49 Stat. 1648. (Emphasis added.) Since adoption of the Revenue Act of 1918 this authority has been executed in part by Regulations 45, Article 215 (c) and its successors, which permit the deduction in years when advance royalties are received. It is not urged, nor could it well be, that the deduction in such circumstances is not one comprehended by the statute. In making that mandate Congress clearly did not intend the privilege to be granted merely on terms which would defeat its operation. Yet this, in my judgment, is exactly the effect of Article 23 (m)–10 (c).

In requiring that "a corresponding amount must be returned as income for the year in which the lease expires, terminates, or is abandoned," the regulation piles up as "income" for a single year the sum of all the deductions taken in the previous ones. Wholly apart from whether in theory or in fact "income" can be said to be realized by thus piling up the deductions,[1] this requirement imposes risks and burdens upon taking the deduction heavier than any advantage to be gained from it and therefore prohibitive.

The consequences hardly could be illustrated better than by the case of Bessie P. Douglas. By taking the deduction during the eight years when she received advance royalties, 1929 to 1936 inclusive, she saved a total in taxes of about $7,000. Then her lease was canceled by the lessee. And in 1937, a year in which she received no cash return from the lease, her tax liability was increased by

---

[1] Compare, e. g., 26 U. S. C. §§ 11–23, and see also 4 Mertens, Law of Federal Income Taxation (1942) § 24.64.

about $26,500 for having taken the deduction in previous years. She was thus forced to pay approximately $19,500 more in taxes than if she had never taken it.

The regulation's destructive effect bears on all who receive advance royalties, not merely on those who actually must return accumulated prior deductions as "income" in a single year. The taxpayer must take the deduction, if at all, as his royalties accrue, not later as the ore is removed. The system of annual accounting is said to require this. Cf. *Burnet* v. *Thompson Oil & Gas Co.*, 283 U. S. 301, 306; *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359. Yet it is said also to require that the deductions be telescoped into "income" for a single year in which the returns they represent are not received, and with an effect in tax burden, by the mere fact of the aggregation, far beyond any which would be imposed if the deductions never had been authorized or taken. Hence all who receive advance royalties are faced with the choice of taking the deductions and thus risking this pyramiding of "income," against the chance the lessee will some day deplete the property, or of foregoing the deductions altogether.

It is true the taxpayer may receive an economic benefit in the release of his ore from the right of another to remove it. And by the regulation's requirement that he restore to his capital account an amount equal to the sum of the accumulated deductions, he also receives a possible future tax benefit in larger deductions allowable if and when he sells or leases the minerals again. But these benefits are wholly uncertain. In fact, release of his ore from the right of removal gives him not income then realized in cash to the amount of accumulated deductions, but unsold ore in the ground which the lessee has found it unprofitable to remove although he has paid for it. The only contingency on which the taxpayer really benefits by the deductions is in the event the lessee ultimately does deplete the property. But it is difficult to

believe Congress deliberately extended the opportunity for deduction to lessors whose property is not in fact depleted by the lessee's operations[2] only to authorize the Commissioner to nullify and penalize that opportunity. This the regulation does, in effect, when it imposes on one who takes the deduction the risk, on a contingency beyond his control, of having to pay in taxes several times the amount of the deductions on the happening of the contingency.

Nor is the regulation reasonably adapted to recoupment of the losses in revenue, wholly proper when incurred but which later events require to be made up. On the contrary, it perverts recoupment by pyramiding income spread in receipt over many years into "income" received in a single, entirely different one. And in a day when the tax rate mounts more often than yearly the skyrocketing effect of the process operates with wholly incalculable effect on the taxpayer, who it will be noted has no control over the contingency which brings it into play.

A regulation which would require the taxpayer to pay the taxes deducted for the prior years together with the usual interest and penalties would be harsh enough in discouragement of taking the deduction. In effect it would penalize one who rightfully takes an allowance as much as one who wrongfully does so. But, even so, this would bear some semblance of reasonable relation to recouping the losses sustained by the revenue and to allocating income to the year in which it is received. However, to amalgamate the deductions into "income" for a single year, in which none of it is actually received, is an entirely different thing. It is to make of the so-called scheme of deductions a snare for the unwary who violate no law

---

[2] Compare Rev. Act of 1913 § II (G) (b); Rev. Act of 1916 § 5 (a) (Eighth) (b) with Rev. Act of 1918 § 234 (a) (9); Rev. Act of 1936 § 23 (m).

but comply with it fully; and at the same time to strain the theory of annual accounting beyond any reasonable application.

The regulation, therefore, both effectively nullifies a privilege which Congress provided the taxpayer shall have and reaches farther than any reasonable recouping provision should go. It is no answer to say deduction is a privilege which Congress need not have extended, or having extended can qualify out of existence. The question is whether Congress did, or authorized the Commissioner to do, the latter. Its language, its prior treatment of the problem [3] and its treatment of a related problem in the identical section of the Revenue Act all point to the conclusion it did neither.

Other questions are raised on the record. It is unnecessary to consider them. In my opinion Congress would not have nullified its grant of the privilege to take "a reasonable allowance for depletion" by enacting Article 23 (m)-10 (c) to make exercising it so hazardous, capricious, and unjust in consequence.[4] That being true, I do not think authority was delegated to the Commissioner to adopt or to the Secretary to approve it. I would reverse the judgment.

MR. JUSTICE MURPHY joins in this opinion.

---

[3] Cf. note 2 *supra*.

[4] The uncertain career of Article 23 (m)-10 (c), adverted to in the Court's opinion, offers no support for Congressional acquiescence in the Commissioner's position before 1932 and only doubtfully suggests it after that date. In this case the nullifying effect of the limitation upon the privilege granted prevents removal of that doubt.