Clyde GUTHRIE and Edith D. Guthrie, et al., Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 15126.

United States Court of Appeals Sixth Circuit.

Sept. 25, 1963.

Michael A. Mulroney, Atty., Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., on the brief, William E. Scent, U. S. Atty., Louisville, Ky., for appellant.

Robert S. Dorsey and Chas. I. Dawson, Louisville, Ky. (Bullitt, Dawson & Tarrant, Louisville, Ky., of counsel), for appellees.

Before WEICK and O'SULLIVAN, Circuit Judges, and PRETTYMAN, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

This is an appeal by the United States from a judgment of the District Court for the Western District of Kentucky ordering the United States to refund $39,619.47 worth of taxes plus interest at 6% per annum from October 31, 1958, to the several taxpayers Guthrie here involved. The issue presented is whether the taxpayers were entitled to treat proceeds obtained from business interruption insurance as "gross income from mining" for percentage depletion purposes under Section 114(b) (4) of the Internal Revenue Code of 1939 and Section 613(b) (4) of the Internal Revenue Code of 1954.

Taxpayers are partners (or personal representatives of partners) in the Harlan Fuel Company, a partnership engaged in the mining, processing, and selling of coal. On January 7, 1953, the tipple, screening facilities, and a portion of the conveyor system belonging to the partnership were destroyed by fire. Prior to this fire, this equipment had enabled the partnership to process 27 different grades of commercially marketable coal. Because of the fire, the mine lay idle for nine days, after which the partnership constructed a temporary tipple. At about the same time, construction was begun on a new permanent tipple. By using the temporary tipple, the partnership resumed processing and selling coal about a month after the fire. This temporary equipment permitted the grad-

ing of only five types of marketable coal. During the twelve months preceding the date of the fire, 274,000 tons of coal were mined and processed by the partnership. This coal was sold for $1,561,409. During the twelve months following the fire, 288,500 tons of coal were mined and processed. This coal was sold for $1,496,415.

The temporary tipple, vibrator screens, and conveyors were destroyed by a second fire which occurred on September 4, 1954. As a result of this second fire, the mine was shut down for 28 days. In the twelve month period preceding the date of this fire, the partnership mined, processed, and sold 191,800 tons of coal for $1,104,949. During the twelve months following the fire, 183,800 tons of coal were mined, processed, and sold for $970,148.

During the year preceding the first fire, the partnership made a profit of $160,000. The year following the first fire, its profit was $41,000. In the year prior to the second fire, the partnership profit was $32,600. During the year following the second fire, no profit was made, but a loss of $100,800 was sustained.

During the years in question, the partnership was insured by various companies against losses resulting from "business interruptions" caused by certain hazards, including fire. These policies were identical, and, in substance, each provided that the partnership should be compensated up to $10,000.00 on the net profit it would have earned but for the damage and consequent interruption of business.[1] Under these poli-

---

1. Pertinent provisions of such policies were:

 "2. If the building(s), structure(s), machinery, equipment or merchandise on the premises described * * * be damaged or destroyed by the peril(s) insured against during the term of this policy and a necessary interruption of business directly results, this Company shall be liable for not exceeding the ACTUAL LOSS SUSTAINED by the Insured, for only such length of time as would be required with the exercise of due diligence and dispatch, to rebuild, re-

 pair or replace such described property as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, to wit:

 "Item 1. $10,000.00 on the net profit which is thereby prevented from being earned and such charges and other expenses * * * as must necessarily continue during the interruption of business, to the extent only that such charges and expenses would have been earned had no loss occurred. This item covers expense of necessary heat, light and power,

cies, the partnership received $225,969.29 after the first fire, and $175,728.36 after the second fire. These amounts were settled upon by the insurance company adjuster and the partnership "by giving due consideration to the experience of the business before the loss and the probable experience thereafter, had no such loss occurred." Of the total proceeds received by it from such insurance, the partnership treated $121,244.36 as representing non-production expenditure and the balance, $280,453.29 as income subject to depletion allowance. Such balance was allocated in varying amounts over the partnership's fiscal years, 1953, 1954 and 1955. The Commissioner of Internal Revenue determined that such proceeds were not income subject to depletion allowance and assessed deficiencies against the partners equal to the deductions taken therefor in the several years involved. These assessments were paid over protest and the instant refund suits were brought.

The Sections of the Internal Revenue Codes of 1939 and 1954 applicable to the matter before us are of such like import that it will suffice here to quote only from the 1954 code. It provides, in pertinent part, as follows:

"§ 611. *Allowance of deduction for depletion*

"(a) General rule.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * *."

"§ 613. *Percentage depletion*

"(a) General rule.—In the case of the mines, wells, and other natural deposits listed in subsection (b),

the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property * * *.

"(b) Percentage depletion rates. —The * * * percentages, referred to in subsection (a) are as follows: * * *

"(4) 10 percent * * * coal * * *.

"(c) Definition of gross income from property.—For the purpose of this section—

"(1) Gross income from the property.—The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining.

"(2) Mining.—The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. * * *

"(4) Ordinary treatment processes.—The term 'ordinary treatment processes' includes the following:

"(A) In the case of coal—cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment."

 By this statute, Congress has recognized that mineral deposits are wasting capital assets. Commissioner of Internal Revenue v. I. A. O'Shaugnessy, Inc., 124 F.2d 33, 36 (C.A. 10, 1941); Parsons v. Smith, 359 U.S. 215, 220, 79 S.Ct. 656, 3 L.Ed.2d 747. The deduction

---

the cost of which is prevented from being earned during the interruption of business."

* * * * * * *

"3(a) Under Item I, 80 per cent (%) of the sum of the annual net profits * * * that would have been earned (had no loss occurred) during the 12 months immediately following the date of damage to or destruction of the described property."

---

* * * * * * *

"11. *Resumption of Operations*: If the Insured, by resumption of complete or partial operation of the property herein described or by making use of other property, equipment or supplies, could reduce the loss resulting from interruption of business, such reduction shall be taken into account in arriving at the amount of loss hereunder."

for depletion of natural resources is predicated on the theory that capital consumed in the production of gross income ought to be returned tax free. Anderson v. Helvering, 310 U.S. 404, 408, 60 S.Ct. 952, 954, 84 L.Ed. 1277, 1280. The depletion allowance in the case of coal here is granted as compensation for the exhaustion of the mineral deposit through its severance and sale. Helvering v. Mountain Producers Corp., 303 U.S. 376, 381, 82 L.Ed. 907, 911; Douglas v. Commissioner of Internal Revenue, 322 U.S. 275, 281, 64 S.Ct. 988, 992, 88 L.Ed. 1271, 1277. "Depletion * * * is an allowance for the exhaustion of capital assets," United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 86, 80 S.Ct. 1581, 1586–1587, 4 L.Ed.2d 1581. Percentage depletion is based upon a fixed percentage of the income realized during the tax year from the severance of minerals from a piece of property. Dragon Cement Company v. United States, 244 F.2d 513, 514 (C.A. 1, 1957), cert. denied, 355 U.S. 833, 78 S.Ct. 50, 2 L.Ed. 2d 45. The fixing of the 10 percent depletion allowance in the case of coal and the varying percentages applicable to other minerals represents a Congressional effort to approximate general fairness in treating income from wasting assets. The determination of such respective percentages was no doubt the product of practical and scientific consideration of what percentage of the gross proceeds of the severed minerals might fairly be allocated as compensation for the exhaustion of their unsevered and capital worth. Impossibility of arriving at formulae that would be demonstrably accurate in all cases resulted in adoption of figures which, though in a measure arbitrary, had bases in considered judgment. United States v. Ludey, 274 U.S. 295, 302, 47 S.Ct. 608, 610–611, 71 L.Ed. 1054, 1059; Helvering v. Mountain Producers Corp., 303 U.S. 376, 381, 58 S.Ct. 623, 625, 82 L.Ed. 907, 911; United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 88, 80 S.Ct. 1581, 4 L.Ed.2d 1581; Kohinoor Coal Co. v. Commissioner, 171 F.2d 880, 883 (C.A. 3, 1948), cert.

den. 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732. Inexactness and inequalities will inevitably flow from such a rule of thumb, but as "an act of grace" such rule may be applied only within the language which Congress used in granting the privilege. Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 321, 55 S.Ct. 174, 178, 79 L.Ed. 383, 389.

Taxpayers are entitled to a depletion allowance based on the sale price of the coal actually mined, processed, and sold. The Commissioner contends, however, that the base upon which the depletion deduction is properly computable should not include the proceeds received from the business interruption insurance. He argues that such proceeds are not income from the actual mining process. We agree. Taxpayers argue that because of the fires, the ordinary treatment processes which the partnership was able to apply to the mined coal were sharply reduced. As a result, the partnership was able to produce only five grades of coal where, prior to the first fire, it had produced 27 grades. This inability to produce more than five grades of coal, it is contended, resulted in a diminished sale price for the coal sold. The proceeds received from the business interruption insurance, then, according to taxpayers, represent the balance of the sales price the partnership would have received had it been able to market 27 grades of coal. Simply stated, the taxpayers' contention is that "gross income from mining" includes money received as compensation for the inability to market its coal at a price higher than that actually received. Such contention, however, does not find support in the statute relied upon.

We have held that the proceeds of business interruption insurance are compensation for earnings which the insured would have enjoyed but for the interruption of business. Miller v. Hocking Glass Co., 80 F.2d 436, 437 (C.A. 6, 1935). The insurance proceeds recovered by the taxpayer here represented its loss arising from its inability to operate as profitably after the fire as before.

This was so because after the fire the partnership was not able to process its coal into all of the 27 grades previously marketed. Had this taxpayer not had the foresight to carry business interruption insurance, its total gross income from mining would have been the amount it received for the coal it was able to mine and market, doing the best it could with its impaired operating ability. That this taxpayer avoided such consequences by carrying insurance does not make the insurance proceeds a part of the price which taxpayer received for its coal. We think these sales proceeds are what constitute "gross income from *mining*." We may not extend the statute's coverage by labeling insurance proceeds as sales proceeds. We have held previously that proceeds of business interruption insurance do not constitute a sale of property. Cappel House Furnishing Company v. United States, 244 F.2d 525, 529 (C.A. 6, 1957). The depletion deduction is based on the income derived from the mineral product in its commercially marketable form. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 86, 80 S.Ct. 1581, 4 L.Ed.2d 1581. As long as the coal mined was commercially marketable when offered for sale by taxpayers, the sale price received would constitute the value of the extracted mineral. Cf. Alabama By-Products Corp. v. Patterson, 258 F.2d 892, 898 (C.A. 5, 1958).

We appreciate the force of appellees' argument that the insurance proceeds made up for diminished sales proceeds and should, for the depletion allowance, be treated as such. Congress, however, did not provide for such transposition, and to do so would require us to construct a theoretical "gross income from mining" rather than a real one. In a similar context, the Supreme Court said that the courts cannot fashion a "theoretical gross income" for depletion purposes, but are limited to a consideration of the actual sale price. Helvering v. Mountain Producers Corp., 303 U.S. 376, 382, 58 S.Ct. 623, 625–626, 82 L.Ed. 907, 912.

Finally, the cases of Burt v. United States, 170 F.Supp. 953, 145 Ct.Cl. 282 (1959) and Higgins v. Commissioner, 33 T.C. 161 (1959) relied on by appellees, are factually and legally inapposite. They merely hold that a lessor of mineral lands is entitled to include as gross income subject to the depletion deduction, realty taxes paid by the lessee in lieu of royalty payments. We find nothing in those cases which detracts from our holding here.

The judgment of the District Court is reversed, with direction to enter judgment for the United States.