PROCTOR MANUFACTURING CORPORATION, Plaintiff and Appellant, v. SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellee.

No. R-63-231.      Decided March 1, 1965.

*Baker & Woods, Luis F. Candal,* and *Gilberto Mayo Aguayo* for appellant. *J. B. Fernández Badillo, Solicitor General, Rodolfo Cruz Contreras* and *Manuel Tirado Viera; Assistant Solicitors General,* for appellee.

Division composed of Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The taxpayer, Proctor Manufacturing Corporation, contends that payments received under a "use and occupancy"

policy as reimbursement for benefits lost during several weeks in which the taxpayer, as the result of a fire in its factory, was compelled to curtail operations are not taxable income because they are exempt benefits under both the Industrial Tax Exemption Act (Act No. 184 of May 13, 1948) and the Puerto Rico Industrial Incentive Act of 1954 (Act No. 6 of December 15, 1953—13 L.P.R.A. §§ 241 to 251).[1] The taxpayer is wrong and, therefore, we affirm the judgment of the trial court to the effect that, since the income in question is not derived from the production of a manufactured product, it is taxable income.

There is no controversy with regard to the facts which raise the question under consideration. The taxpayer requested and was granted, regarding the production of a specific manufactured product, a tax exemption under the aforementioned Industrial Tax Exemption Act. Subsequently, the taxpayer elected to be exempt under the Puerto Rico Industrial Incentive Act of 1954. This exemption was in full force and effect when, near the end of 1957, a fire damaged the taxpayer's factory compelling the taxpayer to curtail operations for a few weeks. As a result, no profit was realized during that period. The taxpayer had, in full force at the time, a "use and occupancy" policy issued by the Philadelphia Manufacturers Mutual Insurance Company which, in its pertinent part, provided:

---

[1] See: Rudick and Allan, *Tax Aspects of Operations under the Puerto Rican Exemption Program*, N.Y.U., 7 Tax Law Rev. 403 (1951–52), several times supplemented, through private publications by the Economic Development Administration, the last one in 1962, and through addendum of 1963; Bhatia, *Tax Exemption in a Developing Economy—A Case Study of Puerto Rico*, 13 Nat. Tax Journal 341 (1960); Goldman, *Tax Exemption in Puerto Rico and the Internal Revenue Code*, 13 Institute of Federal Taxation 1193 (1955); Baker, *Tax Exemption as a Means of Attracting Industry*, 20 Geo. Wash. L. Rev. 253 (1951–52); Baker, *Puerto Rico's Program of Industrial Tax Exemption*, 18 Geo. Wash. L. Rev. 327 (1949–50); Baker and Beckerleg, *Industrial Tax Exemption in Puerto Rico*, XVIII Rev. Jur. U.P.R. 283 (1949); Baker and Curry, *Taxpayer's Paradise in the Caribbean*, 1 Vand. L. Rev. 194 (1947–1948).

" In case of a Use and Occupancy loss of the property herein specified, this Company shall be responsible, under the conditions herein described, for losses actually suffered on the following:

"(A) .     .     .     .     .     .     .     .

"(B) Net profits, prior to the deduction of income taxes, which profits could not be earned during the period of interrupted production or suspension of the business operations."

The taxpayer received under the aforementioned policy the amount of $43,709.05 as lost net benefits during the above-mentioned period. On July 16, 1961, the Secretary of the Treasury of Puerto Rico served the taxpayer a final notice of deficiency in the amount of $12,080.18, as the amount due and owing with regard to taxpayer's 1958 income. The taxpayer, disagreeing with this determination, filed suit before the Superior Court, San Juan Part, requesting a judgment to the effect that the Secretary's determination was without merit and requesting cancellation of the deficiency in question. The Secretary accepted the facts except for the inaccuracy or unlawfulness of the deficiency determination. The issue having been thus joined, the trial court rendered judgment denying the complaint on the grounds that "The amount received constitutes income, § 112(f)(8), Regulations to the 1954 Income Tax Act . . ." and that "Not being income directly derived from the industrial operations of the taxpayer, the amount of $43,709.05 is subject to the payment of income taxes."

The taxpayer, to support his request for review, pointed out that three errors have been committed by the trial court:

1.—"That the trial court erred in applying § 112(f)(8) of the Regulations to the 1954 Income Tax Act to this case because this section is only applicable to nonexempt persons and entities and the taxpayer is an entity exempt from the payment of income taxes."

2.—"The trial court erred in restrictively interpreting the provisions of the Industrial Incentive Act, when in this case, considering the purposes of such law, it follows that a liberal interpretation would not defeat said purposes."

3.—"The trial court erred because the court's interpretation of the aforementioned statutes would discriminate against tax exempt industries, making undesirable the use of contracts warranteeing the continuity of their operations, which is a very desirable commercial protection and available to nonexempt industries."

Because they are closely connected, we will jointly discuss these three points.

Section 112(f)(8) of the Regulations of the 1954 Income Tax Act (13 R.&R.P.R. § 3112(f)–1(c)(8)) reads as follows:

"The proceeds of a use and occupancy insurance contract, which by its terms insured against actual loss sustained of net profits in the business, are not proceeds of an involuntary conversion but are income in the same manner that the profits for which they are substituted would have been."

The taxpayer argues that if the amounts in question *"are income in the same manner that the profits for which they are substituted would have been,"* the only interpretation that can be given this provision is that the proceeds of a policy are not taxable when the proceeds are substituted for nontaxable profits. To that effect the taxpayer concedes that, it having been held that when the profits which would have been obtained are taxable, the proceeds of a use and occupancy policy insuring such profits are also taxable,[2] it must be concluded, *a contrario sensu*, that if the person is exempt from the payment of taxes regarding such benefits (because the taxpayer is exempt, as noted

[2] *Guthrie* v. *U.S.*, 323 F.2d 142 (6th Cir. 1963); *Miller* v. *Hocking Glass Co.*, 80 F.2d 436 (6th Cir. 1935); *Oppenheim's Inc.* v. *Kavanagh*, 90 F.Supp. 107 (D.C. Mich. S.D. 1950).

810

above), it must also be exempt from payment of taxes on the substituted insurance benefits.

In order to reach a decision we must determine whether or not the referred payment made to the taxpayer under the above-mentioned use and occupancy policy in substitution of profits is, according to law, industrial development income, since tax exempt profits under the aforementioned tax exemption act of 1954, which is the law applicable to this case, are only such income as arises from industrial development.[3] The act defines the term "income arising from industrial development" as income derived (1) from the production of a manufactured product, (2) from property engaged in industrial development, and (3) from the operation of hotels fulfilling certain requirements established by the law. (Subsection (a) of § 2 of Act No. 6 of December 15, 1953—13 L.P.R.A. § 242(a).)

■■ In order for the income in question to be exempt from the tax in force, (a) the enterprise obtaining the income, in this case the appellant, should have received a grant of tax exemption,[4] and (b) the income must be derived from the production of a manufactured product. In

[3] Subsection (a) of § 1 of the Industrial Incentive Act of 1954 reads:

"(a) Exempted business is exempt from income tax upon its *industrial development income* derived during the ten years following the date of the commencement of its operations as determined jointly by the Secretary of the Treasury and the Economic Development Administrator of the Commonwealth of Puerto Rico, or by the Governor thereof in the event they are unable to agree on the date of the commencement of operations referred to." (Italics ours.)

[4] Subsection (a) of § 5 of the above-mentioned Act (13 L.P.R.A. § 245(a)) provides:

"(a) *Applications.*—Any natural or artificial person who has established or proposes to establish in Puerto Rico an eligible business, may apply to the Governor of Puerto Rico for the benefits of this Act. The grants of tax exemption under this Act shall be considered in the nature of a contract between the grantee and the Commonwealth of Puerto Rico. The Governor may include in grants of tax exemption hereunder such terms and conditions as in his judgment will further the purposes of industrial development [of §§ 241–251 of this title]." (13 L.P.R.A. § 245(a).)

this case the first requirement is met, but, with regard to the second requirement, the income in question is a substitute of income which, if it were not for the fire, the taxpayer would have derived from the production of a manufactured product. May it be concluded that the income in question, because it was income substituting for production income, is considered as derived from industrial development and, therefore, tax exempt to the taxpayer? To answer this question we must determine the intent or purpose of the Legislature in enacting the law in question. But first we must reiterate, with regard to the rule that tax exemptions must be restrictively interpreted, what was stated in *Club Yaucano* v. *Secretary of the Treasury*, 83 P.R.R. 601, 607 (1961), to wit: "However, this does not mean that the law be strictly construed as necessarily excluding the benefits of exemption, but rather that it is not to be extended beyond ascertainable legislative intent . . . that is, that the interpretation should not be so narrow and literal as to defeat its settled purpose. . . . It is only necessary that such construction be reasonable." The intent of the Legislature to limit the exemption to income actually constituting income derived from the operation of manufacturing articles of commerce, that is, "of industrial development," "from the production of manufactured products,"[5] may be easily inferred from the Statement

---

[5] Section 2(g) of the law in question (13 L.P.R.A. § 242(g)) defines the term "manufactured product" as follows:

"The term 'manufactured product' means not only all products transformed from raw materials into articles of commerce finished by hand or machinery and agricultural products obtained through the process known as hydroponics, but any product with respect to which substantial industrial operations are undertaken in Puerto Rico which, in the judgment of the Governor, merit treatment as a manufactured product within the scope of this law because of their nature and extent, or the technology involved, the employment provided, other contribution made or to be made by the operation to the welfare of the Commonwealth of Puerto Rico, or any one or more of such factors; Provided, however, That the operation shall be carried out substantially as originally represented by the tax exemption petitioner, except as the tax exemption grant may be otherwise modified by

of Motives of the 1954 Puerto Rico Industrial Incentive Act,[6] that is, from the fact therein stated that the tax exemption is directed to develop and create not only new and additional sources of employment through industrial operations, but also to maintain said sources of employment in order to reduce unemployment until it is eliminated. This same purpose is evident in the Puerto Rico Tax Exemption Act of 1948 (see Statement of Motives and § 4(a)(2) of this law), as well as in the Puerto Rico Industrial Incentive Act of 1963, amended by Act No. 99 of June 26, 1964. (See §§ 1(a)(1) and (2) and 2(a)(1) of this law[7]—1 Puerto Rico Legislative Service 419 et seq. (1963), and 2 Puerto Rico Legislative Service 556 (1964).) The results obtained from the application of this legislation from 1948 up to the end of 1964 are eloquent evidence of the extent reached by the said legislative purpose as of December 1964.[8]

---

the Governor in his discretion upon appropriate petition of the grantee. The Industrial Tax Exemption Office shall have authority to draft regulations governing the application of the foregoing definition, and such regulations shall, upon their approval by the Governor, have the force of law, and shall be published in one or more newspapers of general circulation in Puerto Rico. The production obtained from mining operations shall not be considered a manufactured product unless beneficiated or otherwise substantially processed in Puerto Rico, directly by the producer or by an independent enterprise."

[6] The Statement of Motives of Act No. 6 of December 15, 1953, whose short title is Puerto Rico Industrial Incentive Act of 1954, states "That the long range goal of the economic development program is to provide a minimum net income of $2,000 per annum for the great majority of families . . . . That at least 60,000 additional industrial jobs will be needed in order to attain the total goal of the economic development program which is a minimum of 80,000 new industrial jobs in the decade ending in 1960; that such goal will require (a) more diversified industrial operations . . . . That a sound industrial structure able to provide ample employment at higher wages to the growing Puerto Rican labor force . . . ."

[7] Novak, A New Appraisal of Puerto Rico in the Light of Recent Tax Legislation, XXIV-4 Rev. C. Abo. P.R. 671 (1964); Mihaly, Tax Advantages of Doing Business in Puerto Rico, 16 Stan. L. Rev. 75 (1963).

[8] Statistics furnished by the Industrial Development Company of Puerto Rico.

Investment statistic as of June 1962; hotel statistic as of June 1964.

| Factories promoted and assisted | 1,144 |
| Hotels established | 66 |
| Direct employees | 84,834 |

(It is believed by economists that the industrial development program creates employment for the same number of persons in other activities of the economy)

| Weekly payroll of direct employments | $ 3,285,847 |
| Private investments | $720,319,000 |
| Government investments | $ 57,322,000 |

There is no doubt that the income which, in absence of the fire, the taxpayer would have received as a result of its industrial operation would have been exempt from taxation, but this was not the income received by the taxpayer. In effect, in substitution therefor the taxpayer received another kind of income from a completely different source than from its industrial operations, that is, as a result of an insurance policy. There is nothing in the law in question exempting, expressly or implicitly, such income from taxation, nor can it be said that such income is of the type which is derived as a direct result of the employment of workers, from sources of employment, from industrial operations, from the manufacture or processing of commercial articles, that is, from the production of manufactured articles.

■ To extend the meaning of "industrial development income" to include income derived from a use and occupancy policy[9] will upset the legislative purpose and disturb the delicate balance that these exemption laws try to reach. If we decide that such reimbursement is "industrial development income," we would then have to rule that reimbursements received from policies providing for payments in substitution of lost income as a result of labor strikes or lock-

---

[9] *Business interruption or use and occupancy insurance,* 83 A.L.R.2d 885.

outs[10] also constitute "industrial development income." It is obvious how far from the purpose of the law we would stand if we reached such a conclusion.

The intent of the exemption in question is to effect a greatly needed social and financial purpose and to benefit the community. If income is not derived from activities which in the normal operation of a business tend to carry out the purposes of the Legislature and which constitute the proper and adequate activities to reach such purposes—and which were foreseen as may be reasonably determined from the provisions of the law under consideration—such income does not fall within the limits of the exemption. In interrupting the industrial operations, which was the social purpose provided for by the law in cases like the one at issue, even though it is due to accidental causes, the taxpayer did not comply with the operational requirement needed as a condition for the tax exemption claimed.

To admit the taxpayer's contention we would have to consider the insurance payment in question as the theoretical industrial development income, and we are not allowed in law to do so. In *Guthrie, supra,* a coal mine, as a result of two fires, was shut down for a period of time reducing the quality and the quantity of the processed coal. As a consequence, the amount of the sales dropped with a resultant reduction in profits from the operation of the mine. Later, after the second fire, a loss was sustained. To cover the reduction of profits and the loss, the mining partnership in question received substantial payments under a business interruption insurance policy. It was decided that even though the taxpayer was entitled to a depletion allowance on the sale price of the coal actually mined, processed and sold, the base on which the depletion deduction is properly computable should not include the proceeds received from the busi-

---

[10] *Losses covered by insurance against strikes, lockouts, or other labor disputes,* 52 A.L.R. 162.

ness interruption insurance, since such proceeds are not income from the actual mining process. The Court stated:

"The insurance proceeds recovered by the taxpayer here represented its loss arising from its inability to operate as profitably after the fire as before. This was so because after the fire the partnership was not able to process its coal into all of the 27 grades previously marketed. Had this taxpayer not had the foresight to carry business interruption insurance, its total gross income from mining would have been the amount it received for the coal it was able to mine and market, doing the best it could with its impaired operating ability. That this taxpayer avoided such consequences by carrying insurance does not make the insurance proceeds a part of the price which taxpayer received for its coal. We think these sales proceeds are what constitute gross income from mining. We may not extend the statute's coverage by labeling insurance proceeds as sales proceeds. We have held previously that proceeds of business interruption insurance do not constitute a sale of property. . . . We appreciate the force of appellees' argument that the insurance proceeds made up for diminished sales proceeds and should, for the depletion allowance, be treated as such. Congress, however, did not provide for such transposition, and to do so would require us to construct a theoretical gross income from mining rather than a real one."

What the taxpayer actually intends in this case is that we consider income received from a use and occupancy insurance policy as theoretical industrial development income thereby substituting for income derived from the operation of producing a manufactured product, which operation was interrupted, and which income was exempt from taxation under the Puerto Rico Industrial Incentive Act of 1954. The Act does not authorize us to make such a determination.

It is argued that taxing the substitute of an exempt item deprives the exempt industry from using the insurance contract or, at least, makes its use less attractive. It is also argued that such determination is not in harmony with the purposes of the aforementioned legislation of: "providing

. . . incentives and opportunities making the establishment of new industries commercially attractive . . ." and "not to approve any legislation impairing or limiting such exemption or which may defeat the purposes of the law." There is no ground for sustaining this contention. It has not been demonstrated that the tax imposed on the proceeds of the said insurance deprives the enterprise from contracting or using such insurance or makes the insurance less attractive. On the contrary, even though the proceeds of such insurance are subject to taxation, it is wise, financially advisable, profitable and a practice of good industrial management to maintain insurance coverage of this kind. As we have previously stated, the exemption of income derived from such insurance does not fall within the terms of the exemption granted to the taxpayer. Obviously, this conclusion does not impair or limit such exemption or destroy the purposes of the providing law.

For the reasons stated, the judgment rendered in this case by the trial court on August 5, 1963, will be affirmed.